IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-20083
_____


ROBERT O COULSON

                                        Petitioner - Appellant

        v.


GARY L JOHNSON, Director, Texas
Department of Criminal Justice,
Institutional Division


                                        Respondent - Appellee
_____

        Appeal from the United States District Court
            for the Southern District of Texas
                      (4:99-CV-2523)
_____
                      August 7, 2001

Before KING, Chief Judge, and SMITH and PARKER, Circuit Judges.

PER CURIAM:[*]

        Petitioner-Appellant Robert O. Coulson was convicted of

capital murder in Texas state court and sentenced to death.

Petitioner-Appellant appeals the district court's denial of his

petition for a writ of habeas corpus pursuant to 28 U.S.C.

_____

        [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

§ 2254.  Upon denial of Petitioner-Appellant's petition, the district court granted a certificate of appealability on three of his five claims.  Petitioner-Appellant has also filed with this court an application for a certificate of appealability on one additional claim.  For the following reasons, we AFFIRM the judgment of the district court denying habeas relief on the first three claims and DENY Petitioner-Appellant's application for a certificate of appealability.

## I. FACTUAL HISTORY

At approximately 6:15 p.m. on Friday, November 13, 1992, firefighters were called to the scene of a residential fire at 9782 Westview in Houston, Texas.  When they arrived, the firefighters discovered the burned bodies of Otis Coulson ("Otis"), his wife Mary Coulson ("Mary"), their adopted daughters Sarah Coulson ("Sarah") and Robin Wentworth ("Robin"), and Robin's husband Richard Wentworth ("Richard").  Each body had been bound with zip cords or duct tape, and a plastic trash compactor bag had been pulled over each victim's head and secured with duct tape.  It was later learned that all five victims died from asphyxia due to suffocation.  After the victims had died, gasoline had been poured over their bodies, and they had been lit on fire.

The day after the murders, Petitioner-Appellant Robert O. Coulson, Otis and Mary's adopted son and the only remaining

member of the immediate Coulson family, and his roommate Jared Althaus were located by Althaus's brother at Althaus's grandfather's farm, which was situated a few hours outside Houston. At police request, Coulson and Althaus returned to Houston and went immediately to the police station for questioning. Coulson and Althaus informed the police that they had left Houston for the farm at approximately 4:00 p.m. on the day of the murders. In support of their story, Coulson and Althaus produced a gasoline receipt, which was stamped at approximately 4:27 p.m., to demonstrate that they had not been near the Coulson home at the time of the murders.

Two days after this first police interview, on Monday, November 16, Althaus spoke again with police officers and recanted his earlier statement. During this Monday interview with police, Althaus informed the police that he had dropped Coulson off at the Coulson home on Friday afternoon and then picked him up a few hours later. Althaus claimed that he did not know about the murders until the next day.

Finally, on Tuesday, November 17, Althaus gave another account of his actions on the evening of the murders. During this account, Althaus confessed to having a role in the murders. Althaus informed the police that he had helped Coulson plan and carry out the murders. He confessed that, during a three-month time period prior to the murders, he had assisted Coulson in collecting the items used to murder Coulson's family and that, at

3

approximately 4:00 p.m. on the day of the murders, he drove

Coulson to a drop-off point near the Coulson home. Althaus

admitted at trial that he next drove outside Houston to obtain

the gas receipt for their planned alibi and then returned to the

prearranged place at 6:00 p.m. to pick up Coulson once the house

had been set on fire. Althaus stated that he and Coulson then

drove through the back streets of Houston, discarding Coulson's

clothing and the tools used to murder the Coulson family.

Althaus recounted that he and Coulson then drove to his

grandfather's farm to create their alibi. After confessing to

his role in the murders, Althaus accompanied the police in an

attempt to retrace the route taken by Coulson and Althaus when

they were discarding the evidence. The police were able to

retrieve several of the discarded items.[1]

During the time that Althaus was confessing to his role in

the murders, Coulson was attending gatherings of family and

friends, as well as the funeral for the family that

was held on Tuesday, November 17. Then, pursuant to police

instruction, Althaus contacted Coulson on the evening of the

---

[1] Althaus testified that they disposed of, inter alia, a crowbar; a gas can; a stun gun; a backpack; a .9 millimeter gun that had been broken into its individual pieces; and Coulson's tennis shoes, jeans, sweatshirt, baseball cap, and sunglasses. The record reveals that, with Althaus's help, the police were able to recover the crowbar; the gas can; the sweatshirt; the baseball cap; the backpack; a ski mask; and .9 millimeter bullets, a magazine, and a slide mechanism from a .9 millimeter gun.

4

family's funeral and asked Coulson to meet him at a local hotel. Coulson met Althaus at the hotel, and the police recorded the ensuing discussion using an electronic transmitter that had been placed in the room. During the course of the recorded conversation, Coulson made several incriminating statements[2] and repeatedly pressured Althaus to adhere to their previously established alibi. The conversation ended, and Coulson was arrested immediately upon exiting the hotel room.

Coulson was given his Miranda[3] warnings and was placed in a police van to be transported to the police station. En route to the police station, Coulson was questioned by the arresting officers and answered several of their questions. Coulson made more incriminating statements to the police officers during this exchange.

---

[2]   It should be noted that, during the conversation in the hotel room, Coulson never admitted to killing his family.

[3]   Miranda v. Arizona, 384 U.S. 436 (1966).

Coulson was indicted for the murders of Robin[4] and Richard.[5] The following is the district court's thorough and accurate description of the evidence presented at trial[6]:

> At [Coulson]'s trial, the State presented evidence that [Coulson] had planned for several months the murder of his immediate family members at the family home. In all, the guilt-innocence portion of the trial lasted nearly three weeks. During the course of the trial, the State presented a total of twenty-five witnesses and eighty-three exhibits. [Coulson] offered twenty witnesses and twenty-nine exhibits.
>
> During this lengthy trial, the State presented evidence that suggested [Coulson] murdered his entire family in order to inherit each of his parents' estate as the sole heir. The State, however, did not present direct physical evidence linking [Coulson] to the crime. The State presented extensive testimony relating to a confession by [Coulson]'s roommate and co-conspirator Althaus. Althaus testified that he aided [Coulson] in the planning of the murders, drove him to the Coulson residence the evening of the murder, and picked him up after [Coulson] had set the house on fire. Althaus testified that [Coulson] vividly described to him the murders after Althaus picked him up. Althaus also testified that he had created an alibi with [Coulson].
>
> The State also presented testimony that [Coulson] had made comments to friends that indicated he had killed his family. The State also presented the testimony of the arresting officers who testified that, after his arrest, [Coulson] both made comments suggesting he committed the homicides, and that he never actually denied the crimes. Additionally, the

---

[4] As noted supra in the text, Robin was the adopted child of Otis and Mary Coulson. In fact, Robin was the natural sister of Coulson, who was also adopted by Otis and Mary.

[5] Coulson was indicted originally for the murders of Otis, Mary, Sarah, Robin, and Richard. The indictment was subsequently amended to include only the murders of Robin and Richard.

[6] To be clear, at all times in this opinion, the term "trial" refers to the guilt/innocence phase, as opposed to the punishment phase, of Coulson's trial.

State adduced evidence that [Coulson] had previously spoken of killing his family, was inordinately interested in the size of his parents' estate, did not grieve over the loss of his family, and had financial problems.

The State adduced other circumstantial evidence linking [Coulson] to the murders: the murders were accomplished by someone intimately familiar with the Coulson[s'] house and family habits; the Coulson family traditionally met together on Friday nights; and his family may have been anticipating his presence that Friday evening to discuss a business opportunity.

To demonstrate the last piece of circumstantial evidence linking Coulson to the crime, i.e., that the Coulson family appeared to have been anticipating Coulson's arrival to discuss a business opportunity, the State introduced Althaus's testimony that Coulson had called his family members and told them all to be at the Coulson home on Friday, November 13. Moreover, and especially relevant to one of Coulson's claims on appeal, the State introduced an envelope that was found on the desk in Otis's office. The back of the envelope was dated August 16, 1992, and contained notations that detailed terms of a proposed business loan to Coulson. Through the use of photographs offered by the State, the State represented that the envelope was found at the center of Otis's desktop on the night of the murders. The State argued at trial that the envelope, which according to the photographs was prominently displayed on Otis's desk, supported its theory that the Coulson family was expecting Coulson that night.

7

For his part, Coulson testified at trial that he never made any incriminating statements to the police or to his friends. In addition, Coulson attempted to implicate Althaus as the murderer, apparently because Althaus allegedly feared that Coulson's family believed that Althaus was homosexual and had romantic feelings for Coulson. In contrast to Althaus's testimony, Coulson claimed that, instead of dropping him off near the Coulson home, Althaus actually dropped Coulson off at the Town and Country Mall in Houston, where Coulson was to meet his entire family for dinner at Luby's Cafeteria. Coulson testified that Althaus left him at the mall shortly after 4:00 p.m. and that Coulson's dinner plans with his family were at approximately 5:15 or 5:30 p.m. Coulson explained that he went to the mall early because Althaus told him he was meeting a friend, but that Althaus would not reveal the name of his friend. Coulson testified that, once he was dropped off, he walked around the perimeter of the mall to a movie theater and then went to Luby's to wait for his family's arrival. When his family did not appear by 5:45 p.m., Coulson called the Coulson home and received no answer. At around 6:15 p.m., Althaus returned to pick Coulson up, and the two left for the farm. Coulson testified that when Althaus picked him up, Althaus was sweating, "upset," and "anxious." In addition, Coulson stated that Althaus was driving and stopped the car often, claiming that he had to vomit. When questioned by Coulson

8

regarding his demeanor, Althaus stated that he had had a fight with his friend.

Based upon the evidence presented at trial, on June 16, 1994, the jury found Coulson guilty of capital murder. Following the punishment phase of the trial, the jury answered "yes" to the first two special issues submitted pursuant to Article 37.071(b) of the Texas Code of Criminal Procedure. See TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon Supp. 2001).[7] To the third special issue, the jury responded "no." See id. art. 37.071(e)(1).[8]

---

[7] The first two special issues contained in Article 37.071(b) provide:

> (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
>  (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>  (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

TEX. CODE CRIM. PROC. ANN. art. 37.071(b).

[8] The third special issue provides:

> The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:
>     Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a

9

Accordingly, on June 22, 1994, the state trial court sentenced Coulson to death.  See id. art. 37.071(g).[9]

## II. PROCEDURAL HISTORY

In the automatic direct appeal following Coulson's conviction, the Texas Court of Criminal Appeals ("CCA") affirmed his conviction in an unpublished opinion.  See Coulson v. State, No. 71,948 (Tex. Crim. App. Oct. 16, 1996).  Coulson then filed a state application for habeas relief on September 2, 1997.  On October 9, 1998, the convicting court set an evidentiary hearing, which was conducted on November 3, 1998.  On January 5, 1999, the convicting court filed its recommended findings of fact and conclusions of law and ordered that these findings and conclusions be transmitted along with the record of the proceedings to the CCA.  The CCA denied habeas relief on June 9, 1999, stating in an unpublished order that the trial court's recommended findings of fact and conclusions of law were supported by the record.  See Ex Parte Coulson, No. 40,437-01

---

sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. ANN. art. 37.071(e)(1).

[9]  Article 37.071(g) states that "[i]f the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the defendant to death."  TEX. CODE CRIM. PROC. ANN. art. 37.071(g).

10

(Tex. Crim. App. June 9, 1999). At this time, no execution date has been set for Coulson.

Coulson filed his federal petition for a writ of habeas corpus on August 9, 1999.[10] In his federal petition, Coulson raised the following five claims: (1) that his conviction violated the Due Process Clause of the Fourteenth Amendment because the State knowingly presented false evidence against him (i.e., photographic evidence and testimony regarding the location of the envelope) to secure his conviction ("false-evidence claim"); (2) that his conviction violated the Due Process Clause of the Fourteenth Amendment because, having presented false evidence against him in order to secure his conviction, the State failed to disclose information within its possession to demonstrate that the evidence was false, in violation of Brady v. Maryland, 373 U.S. 83 (1963) ("Brady claim"); (3) that his conviction violated the Sixth Amendment's guarantee of effective assistance of counsel because his trial counsel failed to object to the State's use of Coulson's post-arrest, post-Miranda silence, which was protected under Doyle v. Ohio, 426 U.S. 610 (1976) ("Doyle claim"); (4) that his conviction violated the Sixth Amendment's guarantee of effective assistance of counsel because his trial counsel failed to request a limiting instruction on the arresting officers' testimony regarding

_____

[10] Coulson's state habeas counsel was also appointed to represent him during the federal habeas proceedings.

11

Coulson's statements in the police van after his arrest ("limiting-instruction claim"); and (5) that his conviction violated the Sixth Amendment's guarantee of effective assistance of counsel because his trial counsel failed to discover the allegedly false evidence ("failure-to-discover claim"). Respondent-Appellee Gary L. Johnson filed an answer and moved for summary judgment. On August 31, 2000, the district court granted Johnson's motion. At the same time, the district court granted on its own motion a certificate of appealability ("COA") on Coulson's false-evidence claim. See 28 U.S.C. § 2253(c)(1) (Supp. 2001).

Coulson then moved for reconsideration of the judgment and to alter or amend the judgment. On December 12, 2000, the district court granted Coulson's motion for reconsideration of the judgment, but once again granted Johnson's motion for summary judgment. However, the district court did grant in part Coulson's motion to alter or amend the judgment and granted Coulson a COA on his Brady and Doyle claims, but refused to grant a COA on his limiting-instruction and failure-to-discover claims.

Coulson timely appealed. Coulson has also applied to this court for a COA on his limiting-instruction claim.

As noted, the district court granted a COA for Coulson to appeal his false-evidence, Brady, and Doyle claims. Although Coulson's counsel briefed only the false-evidence claim, in an abundance of caution, we elect to address all three claims on

12

which the district court granted a COA.  We will first evaluate Coulson's false-evidence and <u>Brady</u> claims and then turn to his <u>Doyle</u> claim and application for a COA on his limiting-instruction claim, analyzing the latter two claims under the familiar test set out in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

### III. STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment de novo.  <u>See</u> <u>Williams v. Scott</u>, 35 F.3d 159, 161 (5th Cir. 1994).  We consider all of the facts contained in the summary judgment record and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.  <u>See</u> <u>id.</u> Because Coulson filed his petition for federal habeas corpus after April 24, 1997, his appeal is also governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 100 Stat. 1214 (1996).  <u>See</u> <u>Penry v. Johnson</u>, 121 S. Ct. 1910, 1918 (2001); <u>Martin v. Cain</u>, 246 F.3d 471, 475 (5th Cir. 2001).  As such, in our review of Coulson's claims, we are constrained by the dictates of 28 U.S.C. § 2254(d) (Supp. 2001).

Under § 2254(d) of AEDPA, habeas relief is not available to a state prisoner

> with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the
> adjudication of the claim —
>       (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly

13

established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2); see also Gardner v. Johnson, 247 F.3d 551, 557 (5th Cir. 2001); Martin, 246 F.3d at 475.  Under this standard of review, then, "pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)."  Corwin v. Johnson, 150 F.3d 467, 471 (5th Cir. 1998); see also Martin, 246 F.3d at 475-76.

    For questions of law, "[a] state court decision will be 'contrary to' [the Supreme Court's] clearly established precedent if the state court either 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases,' or 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a different result from [Supreme Court] precedent.'"  Penry, 121 S. Ct. at 1918 (quoting (Terry) Williams v. Taylor, 529 U.S. 362, 405-06 (2000)); see also Murphy v. Johnson, 205 F.3d 809, 813 (5th Cir.) ("We review pure questions of law under the 'contrary to' standard of sub-section (d)(1)[.]"), cert. denied, 121 S. Ct. 380 (2000).

    For mixed questions of law and fact, "[a] state court decision will be an 'unreasonable application of' [the Supreme Court's] clearly established precedent if it 'correctly

14

identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" Penry, 121 S. Ct. at 1918 (quoting (Terry) Williams, 529 U.S. at 407-08); see also Murphy, 205 F.3d at 813. In distinguishing an "unreasonable application" from an "incorrect" one, the Supreme Court has clarified that "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." Penry, 121 S. Ct. at 1918; see also (Terry) Williams v. Taylor, 529 U.S. 362, 410-11 (2000).

## IV. FALSE-EVIDENCE CLAIM

### A. The Envelope

As mentioned supra in Part I, in an attempt to demonstrate that the Coulson family was expecting Coulson on the night of the murders and thus placing Coulson at the scene of the crime, the State introduced photographs of Otis's desk with an envelope being prominently displayed in the center of the desktop. On the back of the envelope were the particulars of a proposed business loan from Otis to Coulson. The State argued at trial that the envelope's presence on the desk demonstrated that Otis was expecting his son that evening in order to discuss a new business venture.[11]

---

[11] Testimony at trial revealed that the proposed loan actually related to a prior business venture in which Coulson was interested. Testimony established that this prior venture had fallen through before the murders.

15

At trial, the State introduced State's Exhibits 14, 15, and 16, which were photographs of Otis's desk allegedly taken immediately after the fire. The exhibits were introduced through Detective Beth Halling, a crime scene investigator for the Houston Police Department Homicide Division, who testified under oath that the photographs accurately depicted the crime scene on the night of the murders. Exhibits 15 and 16 are close-up photographs of the desk in the office showing the envelope prominently displayed on the desktop. Exhibit 14, in contrast, is a photograph showing the desk without the envelope on it. When asked about the envelope in Exhibits 15 and 16, Detective Halling testified that she had no personal knowledge of the envelope on the desk because, at the time she took the pictures on the evening of the murders, it was very dark and she did not personally examine the items on the desk.

At the state habeas evidentiary hearing, however, testimony revealed that, instead of being isolated and centered on the desk on the evening of the murders, the envelope actually had been discovered the next day by Houston police officer Dale Atchetee in a stack of papers located on the side of the desktop. Officer Atchetee testified that he found the envelope in the stack of papers under a turtle paperweight, thought it to be relevant, and placed it in the center of the desktop to be photographed.

Further, Detective Halling testified at the state evidentiary hearing that while she did take the photograph in

16

Exhibit 14, she did not take the photographs in Exhibits 15 and 16. She conceded therefore that her testimony at the trial had been "mistaken." It was therefore established at the state evidentiary hearing that Exhibits 15 and 16 were actually taken by another crime scene detective L.R. Verbitskey the day after the murders and were submitted with Detective Halling's photographs for processing.

Coulson argued to the district court that by advancing evidence regarding the position of the envelope on the desk, the State presented false evidence against him, and therefore, his resulting conviction was based upon a denial of due process guaranteed to him by the Fourteenth Amendment. Coulson asserted that the envelope was critical at trial because it was "the only circumstantial evidence at the scene of the crime suggesting [Coulson] had been present at the time of the killing" and that its true location rendered it "actually worthless."[12]

---

[12] Coulson argues on appeal that the district court erred in deciding this issue without first affording him discovery and an evidentiary hearing. He argued for the first time to the district court that not only was the envelope not in the center of the desktop when it was first discovered, it was not on the desktop at all. He claims that Officer Atchetee gave implausible testimony at the state evidentiary hearing when he testified that he discovered the envelope in a stack of papers located at the side of the desktop.

The district court declined to grant the evidentiary hearing because, inter alia, Coulson "did not bring to the attention of the state habeas courts his contention that the envelope was not found on Otis Coulson's desk." The district court concluded that the claim was procedurally barred because "[t]o the extent that this contention could be said to actually be relevant to the false evidence legal claim . . . the argument that the envelope

17

## B. The District Court Properly Concluded that Evidence Regarding the Location of the Envelope Was Not Material

"It is well settled that the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected." Moody v. Johnson, 139 F.3d 477, 484 (5th Cir. 1998); see also Giglio v. United States, 405 U.S. 150, 153 (1972) ("As long ago as Mooney v. Holohan, 294 U.S. 103, 112 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' . . . 'The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" (parallel citations and alteration omitted) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959))). A conviction that results from such a denial of due process cannot be permitted to stand.

---

was somewhere other than under the turtle paperweight on the desk constitutes an unexhausted contention." Moreover, the district court found that Coulson failed to demonstrate cause and prejudice such to overcome the procedural bar. We conclude that the district court did not abuse its discretion in declining to grant an evidentiary hearing on this issue. See Robison v. Johnson, 151 F.3d 256, 268 (5th Cir. 1998) (stating that the petitioner "must still show that the district court abused its discretion in denying the hearing"); see also Barrientes v. Johnson, 221 F.3d 741, 761 (5th Cir. 2000) (quoting in agreement a prior unpublished opinion in that case for the proposition that "'a habeas petitioner fails to exhaust state remedies when he presents additional factual allegations and evidentiary support to the federal court that was not presented to the state court'"), cert. dism'd by 121 S. Ct. 902 (2001); Joyner v. King, 786 F.2d 1317, 1320 (5th Cir. 1986).

18

See <u>United States v. Anderson</u>, 574 F.2d 1347, 1355 (5th Cir. 1978).

To demonstrate a due process violation based upon the State's knowing use of false or misleading evidence, Coulson must show that (1) the evidence was false, (2) the evidence was material, and (3) the State knew that the evidence was false. See <u>Nobles v. Johnson</u>, 127 F.3d 409, 415 (5th Cir. 1997) (citing <u>Giglio</u>, 405 U.S. at 153-54); <u>Westley v. Johnson</u>, 83 F.3d 714, 726 (5th Cir. 1996).

After a review of the evidence presented at the state habeas evidentiary hearing, the state habeas court concluded that Coulson "fail[ed] to show that his right to due process was violated concerning the location, discovery, recovery, and admission into evidence of [the envelope]." Then, in the federal habeas proceedings, regarding the first and third elements of this alleged false-evidence violation, the district court assumed, without deciding, that the trial testimony and evidence relating to the location of the envelope was "false" and concluded that the State "should have known" the evidence was false. We agree that the state evidentiary hearing, which demonstrated that Detective Halling falsely informed the trial court under oath that Exhibits 15 and 16 accurately depicted the scene of the crime on the night of the murders, sufficiently establishes that the evidence regarding the location of the envelope was "false." We also agree that this knowledge may be

19

imputed from the police to the prosecution. See United States v. Antone, 603 F.2d 566, 569 (5th Cir. 1979) ("Had the investigators been federal, their knowledge would have been imputed to the prosecution. In considering use of perjured testimony this Court has declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel."). We pretermit, however, any consideration of whether the State knew the evidence was false (an issue as to which the state habeas court's findings are somewhat unclear), because this case can be resolved by looking at whether the evidence was material.

In Giglio v. United States, the Supreme Court explained that false evidence is "material" if there is "'any reasonable likelihood [that the false evidence could] have affected the judgment of the jury.'" 405 U.S. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)); see also Barrientes v. Johnson, 221 F.3d 741, 756 (5th Cir. 2000), cert. dism'd by 121 S. Ct. 902 (2001); Moody, 139 F.3d at 484; Nobles, 127 F.3d at 415; Westley, 83 F.3d at 726; Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).

This court has recognized the difference between the materiality standard for false-evidence claims, as described in Giglio, and the one for Brady[13] claims:

> We observe that different standards of materiality apply to Brady claims and claims that the prosecution has knowingly used perjured testimony or false evidence. The materiality standard for Brady claims, regardless of whether the defense made a specific or general request (or no request at all) for the withheld evidence prior to trial, is as follows: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Conversely, if the prosecutor has knowingly used perjured testimony or false evidence, the standard is considerably less onerous: the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict[.]"

Kirkpatrick, 992 F.2d at 497 (emphasis added) (footnotes and some internal quotations omitted) (quoting James v. Whitley, 926 F.2d 1433, 1439 (5th Cir. 1991), and United States v. Bagley, 473 U.S. 667, 679 n.9 (1985), respectively).

Furthermore, materiality is a mixed question of law and fact. See Nobles, 127 F.3d at 416. As such, to the extent that the state habeas court adjudicated the issue of materiality on the merits, we are precluded from affording habeas relief to Coulson unless the state court's decision "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."

---

[13] Brady v. Maryland, 373 U.S. 83 (1963).

21

28 U.S.C. § 2254(d)(1); see also Murphy v. Johnson, 205 F.3d 809, 813 (5th Cir.), cert. denied, 121 S. Ct. 380 (2000).

The district court addressed the materiality issue in Coulson's false-evidence claim in two extremely thorough and well-reasoned memorandum opinions, one addressing Coulson's application for a writ of habeas corpus and the second examining Coulson's claim on his motion for reconsideration. In its first memorandum opinion, the district court concluded that there was "compelling independent" evidence which precluded a finding that there was any reasonable likelihood that the jury "would have been influenced by the envelope's true location" and that the evidence "suggests strongly that [Coulson] would have been convicted even absent the allegedly fabricated evidence."

On appeal, Coulson contends that the district court "took a wrong turn when it relied on the construction of the Giglio standard [of materiality] deriving from United States v. Anderson, 574 F.2d 1347, 1354 (5th Cir. 1978)." Coulson argues that, instead of asking whether the jury's verdict might have been affected, the district court relied on Anderson's language to hold that in order for a court to find materiality, it must conclude that the jury's verdict might have been different. See Anderson, 574 F.2d at 1356 ("A new trial is necessary when there is any reasonable likelihood that disclosure of the truth would have affected the judgment of the jury, that is, when there is a reasonable likelihood its verdict might have been different."

22

(emphasis added)).  Coulson asserts that this underscored

language in <u>Anderson</u> places a "gloss" over the <u>Giglio</u> standard,

which incorporates an "outcome-determinative" component, making

proof of materiality a more onerous burden for the accused — a

burden equivalent to the one required by <u>Brady</u>.

At one point in its first memorandum opinion, the district

court did quote <u>Anderson</u> as stating, "A new trial is necessary

when there is any reasonable likelihood that disclosure of the

truth would have affected the judgment of the jury, that is, when

there is a reasonable likelihood the verdict might have been

different."[14]  However, while the court did recite this standard,

it made perfectly clear that it was applying the <u>Giglio</u> "affected

the judgment" standard.  In fact, in a footnote, the district

court recognized the difference between the <u>Giglio</u> and

<u>Brady</u> standards, observing that the <u>Giglio</u> materiality standard

_____

[14]  We note that while <u>Anderson</u> does define the false-
evidence materiality standard in this language, the remainder of
the <u>Anderson</u> opinion recognizes that "[e]ach type of situation
requires the application of a separate analysis and a distinct
test for materiality in order to determine whether or not the
alleged suppression was so fundamentally unfair as to deny the
Due Process right of a fair trial."  574 F.2d at 1353.  The
<u>Anderson</u> court recognized the appropriate standard for false-
evidence claims that a conviction must be set aside "'if there is
any reasonable likelihood that the false testimony could have
<u>affected</u> the judgment of the jury.'"  <u>Id.</u> at 1355 (emphasis
added) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1975)).
The court also acknowledged that the false-evidence materiality
standard was the "lowest threshold."  <u>See id.</u>  Thus, Coulson is
correct that a proper reading of <u>Anderson</u> cannot be based solely
on the language adopted by the district court in its first
memorandum opinion.

23

was "considerably less onerous" than the <u>Brady</u> standard.[15]

Still, in "an exercise of caution," the district court, in its second memorandum opinion, reconsidered its judgment in light of Coulson's argument that it had applied a standard equivalent to the one in <u>Brady</u> and arrived at the same conclusion as it did in its first memorandum opinion — that "[t]here is no reasonable likelihood that in this case the false evidence could have affected the jury's verdict."  We agree with the district court that, considering the compelling independent evidence adduced at trial, there is no reasonable likelihood that the evidence regarding the location of the envelope could have affected the judgment of the jury.

Materiality must be evaluated in light of all of the evidence.  <u>See</u> <u>United States v. Magouirk</u>, 680 F.2d 108, 110 (11th

---

[15]  The district court explained:

> It should be noted that the standard for materiality for the presentation of false testimony is different than the materiality standard for <u>Brady</u> claims.  The materiality standard for <u>Brady</u> claims focuses on whether there is a reasonable probability that, had the evidence been disclosed to the defense, <u>the result of the proceeding would have been different</u>.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  The materiality standard for the presentation of fraudulent testimony, however, is considerably less onerous: the conviction must be set aside if there is any reasonable likelihood that the false testimony <u>could have affected the jury's verdict</u>[.]

(Internal quotations omitted, citations omitted, and emphasis added).

24

Cir. 1982) ("The false testimony must be material before a conviction will be overturned, and materiality must be evaluated in light of all the evidence adduced at trial."); Anderson, 574 F.2d at 1355; cf. United States v. Valenzuela-Bernal, 458 U.S. 858, 874 (1982); United States v. McLernon, 746 F.2d 1098, 1122 (6th Cir. 1984). At the same time, however, our review of the independent evidence is not a sufficiency of the evidence review. See United States v. Barham, 595 F.2d 231, 242 (5th Cir. 1979) ("There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question."); cf. Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("The second aspect of [United States v. ]Bagley[, 473 U.S. 667 (1985)] materiality bearing emphasis here is that it is not a sufficiency of evidence test."); United States v. Smith, 77 F.3d 511, 515 (D.C. Cir. 1996) (stating, in evaluating a Brady claim, that "the test for materiality is not a sufficiency-of-the-evidence test").

As we explained above, false evidence is "material" only if there is "'any reasonable likelihood [that it could] have affected the judgment of the jury.'" Giglio, 405 U.S. at 154 (quoting Napue, 360 U.S. at 269); see also Moody, 139 F.3d at 484. In United States v. Bagley, the Supreme Court explained that this materiality standard "is equivalent to the Chapman[ v. California, 386 U.S. 18 (1967)] harmless-error standard." 473 U.S. 667, 679 n.9 (1985); see also United States v. Alzate, 47

F.3d 1103, 1110 (11th Cir. 1995); Barham, 595 F.2d at 242 ("[The false-evidence materiality standard] is the brother, if not a twin, of the standard ('harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless."). Under the Chapman standard, then, "the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman, 386 U.S. at 24. "A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.'" Barham, 595 F.2d at 242 (quoting United States v. Agurs, 427 U.S. 97, 104 (1975)).

"To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question[.]" Yates v. Evatt, 500 U.S. 391, 403 (1991), overruled on other grounds by Estelle v. McGuire, 502 U.S. 62 (1991). Thus, under Chapman, a reviewing court must "make a judgment about the significance of the presumption [created by the false evidence] to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption." Id. at 404.

The district court recognized that "[t]he envelope was one of many pieces of evidence that the State introduced at trial to prove [Coulson]'s motive and opportunity to commit the murders"

26

and that "[t]he envelope was only a small piece of a complex evidentiary record and the State's argument about it was one of many contentions in closing argument at the trial."[16]  The district court pointed to the following independent evidence of Coulson's guilt: (1) statements made by Coulson in the tape-recorded conversation with Althaus and his insistence that Althaus should stick by the alibi the two had created; (2) Coulson's statements to his friend Kenneth Smith, including "I could have run.  But what the hell, I did it, and I'm not going to run."; (3) evidence that suggested Coulson's alibi was manufactured; (4) evidence that Coulson did not grieve over the death of his family members; (5) evidence that someone who was intimately familiar with the Coulson residence committed the murders; (6) statements by Coulson in which he ostensibly joked about his parents spending his inheritance and about them dying; (7) evidence that Coulson had financial difficulties and desired to live beyond his means; (8) evidence that Coulson called the family lawyer soon after the murders to inquire into the size of his inheritance, his desire to have his parents' wills probated

---

[16]  The district court also evaluated the effect of the evidence on Althaus's testimony, concluding that "while the supposed location of the envelope did tend to corroborate one small aspect of Althaus's testimony, i.e., that [Coulson] notified his family that he would visit the Coulson house the evening of the murders, evidence concerning the true location of the envelope would not necessarily discredit Althaus's testimony."  We agree with the district court that the fact that the envelope was not located in the center of the desktop does not necessarily call Althaus's testimony into doubt.

as soon as possible, and his concern over the fact that another heir to his parents' estate might exist; (9) testimony by Althaus's brother that Coulson stated, "My parents have screwed me for the last time.  I'm going to kill them."; (10) testimony demonstrating that Coulson had "precise knowledge" as to where each of the five bodies were found; and (11) Coulson's testimony that he knew Robin and Richard went to the Coulson residence every Friday night.[17]

We agree with the district court that "[g]iven the overwhelming quantity and quality of the other evidence in the record supporting the jury's verdict, . . . the introduction of erroneous information concerning the location of the envelope was not 'material' for the purpose of false evidence claims, i.e., that there was a reasonable likelihood that a disclosure of the truth would have affected the judgment of the jury." (Citations omitted).[18]  Without minimizing the error of the State in

_____

[17]  Like the district court, in reviewing the independent evidence, we do not take into account Coulson's statements made to the arresting officers, as they are the subject of Coulson's limiting-instruction claim.  See infra Part VI.C.  We conclude the independent evidence demonstrates a lack of materiality without these statements.

[18]  Coulson charges that the "improper willingness to view ambiguities and conflicts in the record in the light most favorable to the conclusion that the false evidence was not material permeate[d] the district court's entire analysis." Coulson contends that the evidence upon which the district court relied can not be considered "compelling" because it was "ambiguous" and "hotly contested."  While the summary judgment standard requires that a court entertaining a motion for summary judgment must view the evidence in the light most favorable to

28

introducing the inaccurate evidence and testimony, when measured against the other independent evidence of Coulson's guilt, we conclude that the effect of the evidence regarding the location of the envelope was "comparatively minimal" and thus did not "contribute to" the jury's verdict, such that the jury still would have found Coulson guilty beyond a reasonable doubt.  See Chapman, 500 U.S. at 405.  Accordingly, the state habeas court's decision did not rest on an unreasonable application of federal law, 28 U.S.C. § 2254(d)(1), and we affirm the district court's grant of summary judgment in favor of Johnson on Coulson's false-evidence claim.[19]

---

the nonmovant, in habeas proceedings, that court is also bound by the dictates of AEDPA.

The state habeas court made numerous findings of fact regarding the evidence that was presented at trial on which the district court (and this court) relied.  Coulson points to his testimony at trial to demonstrate that the evidence cited by the district court was "hotly contested."  We believe, however, that Coulson has not adduced "clear and convincing" evidence for us to conclude that the state habeas court's factual findings are erroneous.  See 28 U.S.C. § 2254(e)(1) (Supp. 2001) ("The applicant shall have the burden of rebutting the presumption of correctness [of the state court's factual findings] by clear and convincing evidence.").  Therefore, the district court properly considered the above-cited evidence to conclude that materiality was lacking.

[19]  In its second memorandum opinion, the district court also conducted a Brecht v. Abrahamson, 507 U.S. 619 (1993), harmless-error review, stating that in Barrientes v. Johnson, 221 F.3d at 756, this court held that a reviewing court utilizing the "any reasonable likelihood" standard of materiality must apply the Brecht harmless-error standard if a petitioner demonstrates a valid claim.  Under the Brecht harmless-error standard, a court must consider whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 637 (internal quotations omitted) (quoting Kotteakos v. United

29

## V. BRADY CLAIM

In his brief supporting his federal petition for a writ of habeas corpus, Coulson argued to the district court that he was entitled to relief under Brady v. Maryland, 373 U.S. 83 (1963), because "of the failure of the prosecution to disclose its knowledge . . . that its evidence showing the location of the envelope . . . on the night of the murders was false."  He claimed that the evidence adduced at the state habeas proceeding demonstrated that the State had the information at its disposal to show the jury that State's Exhibits 15 and 16 were not taken by Detective Halling on the night of the murders and that the envelope had, in fact, been moved from its original location and placed in the center of the desktop.  Coulson argued that the State's failure to disclose this information violated his due process rights.

"The suppression of evidence material to guilt or punishment violates a defendant's fundamental due process rights."  Dowthitt v. Johnson, 230 F.3d 733, 755 (5th Cir. 2000), cert. denied, 121

_____

States, 328 U.S. 750, 776 (1946)).
    We note that in Barrientes, this court did not require that courts in this circuit conduct such a review; we only "assume[d], without deciding," that the application of the Brecht harmless error standard of review would be appropriate in that case. However, even if we were to assume here (again, without deciding) that such an analysis is necessary, we agree with the district court that any error would not require reversal because the false evidence in this case does not meet the Brecht standard of having a "substantial and injurious effect or influence in determining the jury's verdict."  Id.

S. Ct. 1250 (2001).  The State's duty to disclose such evidence applies even when the defendant made no request for it.  See Strickler v. Greene, 527 U.S. 263, 280 (1999).  To demonstrate a Brady violation, Coulson must show that (1) the evidence was favorable to him, (2) the State suppressed the evidence, and (3) the evidence was material.  See Strickler, 527 U.S. at 281-82; United States v. Hughes, 230 F.3d 815, 819 (5th Cir. 2000); Dowthitt, 230 F.3d at 755.  As with Coulson's false-evidence claim, the materiality component is also the dispositive element on this claim.

For the Brady materiality analysis, evidence is considered "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Bagley, 473 U.S. at 682.

The state habeas court concluded that Coulson failed to demonstrate "that either the police or the prosecution manufactured evidence or suppressed information concerning the location, discovery, recovery, and admission into evidence of [the envelope]."  The district court held that the state court's conclusion was not contrary to, and did not involve an

31

unreasonable application of, Brady.  See 28 U.S.C. § 2254(d)(1).
We agree.

As we stated above, the dispositive issue here is whether the evidence regarding the true location of the envelope was material.  Coulson's Brady claim fails on this point.  In Part IV.B supra, we observed that Brady's standard of materiality is more demanding than that for false-evidence claims (i.e., Brady requires a showing that, without the challenged suppression, the outcome would have been different, not merely affected).

Because we have already determined that Coulson's false-evidence claim does not meet the less onerous Giglio materiality standard, it "necessarily follows" that his Brady claim is similarly doomed.  Cf. United States v. Anderson, 574 F.2d 1347, 1356 (5th Cir. 1978) ("Once we have concluded that the challenged suppression fails to satisfy the lowest Brady doctrine threshold for materiality and reversal, it necessarily follows that the application of higher thresholds, which require greater showings of materiality in order to gain a reversal, cannot aid Anderson in his cause.").  Accordingly, because there is no reasonable probability that the result of the proceeding would have been different had the State disclosed evidence regarding the true location of the envelope, we conclude that district court properly granted summary judgment in favor of Johnson on Coulson's Brady claim.

32

## VI. INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS

We now evaluate Coulson's claims that his conviction violated the Sixth Amendment's guarantee of effective assistance of counsel because his trial counsel (1) failed to object to the State's use of Coulson's post-arrest, post-Miranda silence, which was protected under Doyle v. Ohio, 426 U.S. 610 (1976), and (2) failed to request a limiting instruction on the arresting officers' testimony regarding Coulson's statements in the police van after his arrest.  Our review under AEDPA has many layers.  Regarding Coulson's Doyle claim, in resolving the question whether the state habeas court unreasonably applied the well-established Strickland v. Washington, 466 U.S. 668 (1984) test for ineffective assistance of counsel, we must also decide whether there was a predicate constitutional Doyle error and whether the state habeas court was objectively unreasonable in applying that clearly established federal law.  We address first the Strickland standard and then the Doyle claim within that standard.  We then turn to Coulson's second ineffective assistance claim involving the limiting instruction.

### A. The Standard for Ineffective-Assistance-of-Counsel Claims

Ineffective-assistance-of-counsel claims are evaluated under the standard announced in Strickland.  See 466 U.S. at 687.  To obtain relief for ineffective assistance of counsel, Coulson must demonstrate that (1) trial counsel's performance was deficient

33

and (2) the deficient representation prejudiced his defense.  See id.; Kitchens v. Johnson, 190 F.3d 698, 701 (5th Cir. 1999).

Deficient performance is established by demonstrating that "counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688; Kitchens, 190 F.3d at 701.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687; see also (Terry) Williams v. Taylor, 529 U.S. 362, 390 (2000).

The latter showing of the Strickland test — that counsel's performance prejudiced the defendant — requires the defendant to demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687; (Terry) Williams, 529 U.S. at 390.  To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694; (Terry) Williams, 529 U.S. at 391.

Under AEDPA, because they involve mixed questions of law and fact, ineffective-assistance-of-counsel claims are evaluated under the standard of review contained in 28 U.S.C. § 2254(d)(1). See Kitchens, 190 F.3d at 701.  As stated, a federal habeas court is precluded from granting relief on Coulson's claims, unless "the state court decision rested on 'an unreasonable application

34

of application of clearly established federal law.'" Id. (quoting 28 U.S.C. § 2254(d)(1)); see also supra Part III.

## B. *Doyle* Claim

After Coulson's arrest, the arresting officers placed him in the back of a police van to transport him to the police station. Coulson received his Miranda warnings and then answered several of the officers' questions, making incriminating statements in the process. During this exchange with the officers, Coulson did not deny his involvement in the murders.

At trial, Coulson testified on his own behalf and, on direct examination, categorically denied any involvement in the murders. Furthermore, on direct examination, Coulson denied making the incriminating statements in the back of the police van, including an admission to killing his family. On cross-examination, the State asked him three separate times whether, when questioned by the officers in the back of the van, he denied his involvement in the murders. Each time, Coulson responded that he did not deny killing his family members.[20]

Coulson argued to the district court that the prosecutor's questions highlighted the fact that he was silent instead of speaking up and denying his role in the murders. Coulson contended to the court that this post-arrest, post-Miranda silence was protected by Doyle and that his trial counsel's

---

[20] See infra notes 23 & 24.

35

failure to object constituted ineffective assistance of counsel. Coulson argued that there was "no imaginable strategic justification for deliberately allowing the prosecutor illegally to impeach [him] even once, much less repeatedly" and that counsel's error denied him a fair trial.

The state habeas court concluded that "[t]he State properly attempted to impeach [Coulson] concerning his prior, exculpatory testimony presented during direct examination that he had told police officers certain things after his arrest, but he had not told police that he killed his family." Furthermore, the state court determined that Coulson failed to demonstrate that the result of the proceeding would have been different if counsel had objected to the questions by the State.

In Doyle, the Supreme Court held that the Due Process Clause prohibits the government from using a defendant's post-arrest, post-Miranda silence to create an inference of guilt. See Doyle, 426 U.S. at 617-18[21]; see also United States v. Garcia-Flores,

_____

[21] The Supreme Court explained why this prohibition is necessary:

> Despite the importance of cross-examination, we have concluded that the Miranda decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of

36

246 F.3d 451, 455 (5th Cir. 2001).[22]  <u>Doyle</u> does not apply,

however, "to cross-examination that merely inquires into prior

inconsistent statements."  <u>Anderson v. Charles</u>, 447 U.S. 404, 408

(1980) (per curiam).  This is so because "[s]uch questioning

makes no unfair use of silence, because a defendant who

voluntarily speaks after receiving <u>Miranda</u> warning has not been

induced to remain silent."  <u>Id.</u>

As the state habeas court found, Coulson "voluntarily spoke"

to the arresting officers after being placed in the van and read

his <u>Miranda</u> warnings.  However, the fact that Coulson spoke to

the police, without more, does not mean that Coulson's silence

---

these <u>Miranda</u> rights.  Thus, every post-arrest silence
is insolubly ambiguous because of what the State is
required to advise the person arrested.  Moreover,
while it is true that the <u>Miranda</u> warnings contain no
express assurance that silence will carry no penalty,
such assurance is implicit to any person who receives
the warnings.  In such circumstances, it would be
fundamentally unfair and a deprivation of due process
to allow the arrested person's silence to be used to
impeach an explanation subsequently offered at trial.

<u>Doyle</u>, 426 U.S. at 617-18 (footnotes and citations omitted).

[22]  In <u>United States v. Shaw</u>, this court recognized that the
<u>Doyle</u> standard is "strict."  <u>See</u> 701 F.2d 367, 382 (5th Cir.
1983).  Moreover, we have repeatedly observed that "virtually any
description of a defendant's silence following arrest and a
<u>Miranda</u> warning will constitute a <u>Doyle</u> violation."  <u>Id.</u>; <u>see
also</u> <u>United States v. Rodriguez</u>, 43 F.3d 117, 121 (5th Cir.
1995); <u>United States v. Pennington</u>, 20 F.3d 593, 599 (5th Cir.
1994); <u>United States v. Laury</u>, 985 F.2d 1293, 1303 (5th Cir.
1993); <u>United States v. Blankenship</u>, 746 F.2d 233, 238 (5th Cir.
1984).  However, although this court has continuously professed
this belief, we have qualified it by stating that "a prosecutor's
comments must be viewed in context."  <u>Pennington</u>, 20 F.3d at 599;
<u>see also</u> <u>Laury</u>, 985 F.2d at 1303; <u>Blankenship</u>, 746 F.2d at 238.

37

was automatically admissible.  See Pitts v. Anderson, 122 F.3d 275, 280 (5th Cir. 1997) (stating that this rule "does not mean that anytime a defendant makes a post-Miranda statement the prosecution has carte blanche to use the defendant's silence to impeach him"); United States v. Pennington, 20 F.3d 593, 599 (5th Cir. 1994) ("[T]he defendant's willingness to give some statements after arrest does not give the prosecutor the right to impeach him by commenting on what he did not say.").  Instead, to determine whether a Doyle violation occurred at trial, this court applies two alternative tests.  See United States v. Shaw, 701 F.2d 367, 381 (5th Cir. 1983).  Pursuant to these tests, a court entertaining a Doyle claim must determine (1) "whether the [prosecutor's] 'manifest intent' was to comment on the defendant's silence" or, alternatively, (2) "whether the character of the remark was such that the jury would 'naturally and necessarily' construe it as a comment on the defendant's silence."  Id.; see also United States v. Laury, 985 F.2d 1293, 1303 (5th Cir. 1993); Pennington, 20 F.3d at 599.

The district court concluded that the prosecutor's intent in asking each time whether Coulson denied killing his family was not to focus on Coulson's right to remain silent, but to focus on "why at arrest he admitted to the murders and failed to deny killing his family, but at trial he asserted clear denials." Because it concluded that the prosecutor intended only to impeach Coulson, the court determined that there was no Doyle violation.

38

As we explain below, while we differ somewhat from the district court in our approach to some of the alleged Doyle errors, we cannot say that the state habeas court applied Strickland in an objectively unreasonable manner.

First, we do agree with the district court that the third exchange between the prosecutor and Coulson,[23] if taken in context, could qualify as an attempt to impeach Coulson on his prior inconsistent statements to the police. In that exchange, the prosecutor appears to be attempting to demonstrate that Coulson's testimony at trial — that he was at the Town and Country Mall at the time of the murders — was inconsistent with his prior statements to the police that he and Althaus were out of town at the farm. If Coulson had actually gone to the mall, instead of the farm, he arguably should have told the police upon

---

[23]   The third exchange between the State and Coulson went as follows:

Q   Now, if your alibi story wasn't true, that still didn't make you guilty, did it?

A   Didn't make me what?

Q   Didn't make you guilty, did it?

A   Guilty of lying to the police about my alibi story, yes, sir.

Q   And of course, you never said anything to the police officers when they arrested you about, "Look, all I did was lie about the alibi. I had nothing to do with killing my parents." You never said that?

Q   No, sir.

39

his arrest.  Therefore, the prosecution's questions could have been "designed to highlight the inconsistenc[ies]" between Coulson's alibi and his trial testimony.  See Pitts, 122 F.3d at 282.

However, in the first two instances that the prosecution questioned Coulson regarding whether he denied killing his family,[24] the questions were neither preceded nor followed by any reference to any prior inconsistent statements or admissions made by Coulson in the police van.  In simple terms, the questions came "out of the blue."  It is, therefore, less clear that these questions did not result in a Doyle violation.

Even if we assume arguendo that a Doyle violation occurred in connection with the first two statements and that counsel's failure to object to the Doyle violation constituted performance sufficiently deficient to violate Strickland (a conclusion we do not make here), we still must determine whether Coulson was

---

[24] Specifically, the following cross examination took place between the State and Coulson:

(1)  Q  At any time that you talked to the police after you were arrested, did you deny that you killed your family.

     A  No, sir.  I don't believe I mentioned anything at all about anything.

(2)  Q  Now, did you ever deny to the police officers that you killed your parents?

     A  No, sir.  I didn't say anything.

40

prejudiced thereby. We conclude that the state habeas court did not make an unreasonable application of federal law when it decided that Coulson failed to demonstrate that the result of the proceeding would have been different if counsel had objected to the questions by the State. It is evident that, in making its determination of lack of prejudice, the state habeas court considered the totality of the evidence that was before the jury. As demonstrated supra in Part IV.B, the evidence of Coulson's guilt, although circumstantial, was compelling, and it is clear that had trial counsel objected to the questions, there is no reasonable probability that the jury verdict would have been different. See Strickland, 466 U.S. at 694; (Terry) Williams, 529 U.S. at 391. Accordingly, the state habeas court did not apply Strickland in an objectively unreasonable manner, and the district court was correct in granting summary judgment in favor of Johnson on Coulson's Doyle claim.

### C. Limiting-Instruction Claim

Because the district court refused to grant Coulson a COA on his limiting-instruction claim, Coulson must first obtain a COA before we can review the district court's denial of habeas relief. See 28 U.S.C. § 2253(c)(1)(A) (Supp. 2001); see also Dowthitt v. Johnson, 230 F.3d 733, 740 (5th Cir. 2000), cert. denied, 121 S. Ct. 1250 (2001). Therefore, Coulson has applied to this court for a COA on his limiting-instruction claim. For the following reasons, we deny Coulson's request.

41

*1. Standard of Review for a COA*

Under AEDPA, we are precluded from issuing a COA to Coulson unless he makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see also Kutzner v. Johnson, 242 F.3d 605, 608 (5th Cir. 2001).  "This standard 'includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" Dowthitt, 230 F.3d at 740 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  If the district court has denied a petition for a writ of habeas corpus on substantive grounds, Coulson must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Kutzner, 242 F.3d at 608 (internal quotations omitted) (quoting Slack, 529 U.S. at 484).  Furthermore, "the determination of whether a COA should issue must be made by viewing the petitioner's argument through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000), cert. dism'd by 121 S. Ct. 902 (2001); see also Kutzner, 242 F.3d at 608.

*2. Coulson Has Failed to Make a Substantial Showing of*

*the Denial of a Constitutional Right with Respect*

*to His Limiting-Instruction Claim*

42

As discussed supra in Part VI.B, after Coulson was arrested, he was placed in a police van and was questioned by police.  At Coulson's trial, the State introduced in rebuttal the testimony of two of the arresting officers who rode with Coulson in the back of the van to the station.  Those officers testified that, en route to the police station, Coulson made several incriminating statements and confessed to killing his family.  At no point during this rebuttal testimony did trial counsel seek a limiting instruction to inform the jury that the testimony should have been considered only for its impeachment value.  Coulson contends that trial counsel provided deficient performance when they failed to ask for such a limiting instruction at trial.

Under Texas law, "[n]o oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless" the statement is recorded under certain delineated circumstances. See TEX. CODE. CRIM. PROC. art. 38.22, § 3 (Vernon 1979 & Supp. 2001).  However, this rule does not preclude "the admission . . . of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness[.]"  See id. § 5.  If such a statement is offered by the State against the defendant, the defendant is entitled to a limiting instruction that the jury may only consider the evidence for its impeachment value. See TEX. R. CRIM. EVID. 105(a); cf. TEX. R. EVID. 105(a).

43

The state habeas court stated in its findings of fact that trial counsel claimed in their affidavits that "they did not request a limiting instruction because the oral statement was 'probably admissible as an admission against penal interest' and because they did not think they were entitled to such an instruction." Furthermore, the state court concluded as a matter of law that Coulson "fail[ed] to show that the outcome of the proceeding would have been different if counsel had requested and received a limiting instruction concerning [Coulson]'s oral statement." The state habeas court also concluded that Coulson's "conviction is supported by <u>sufficient evidence</u>, notwithstanding [his] oral admission; [Coulson]'s testimony itself create[d] a credibility issue between [Coulson] and many of the State's witness; and, Jared Althaus' testimony as an accomplice [was] corroborated by extensive evidence other than [Coulson]'s oral statement." (Emphasis added).

The district court[25] recognized that the state habeas court "referred to an improper standard when it noted that sufficient evidence supported [Coulson]'s conviction without the police

---

[25] Instead of focusing on whether counsel's performance was deficient, however, the district court determined that because the "thrust" of the state habeas court's decision focused on potential prejudice, it "need[ed] only [to] examine the effect of failing to seek a limiting instruction." See Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one.").

44

officers' testimony of [Coulson]'s admissions to them."  This is because the Strickland test, which is "identical to" the Brady standard, is not a sufficiency of the evidence test.  See Felder v. Johnson, 180 F.3d 206, 214 (5th Cir.), cert. denied, 528 U.S. 1067 (1999); see also Martin v. Cain, 246 F.3d 471, 477 (5th Cir. 2001); East v. Johnson, 123 F.3d 235, 239 (5th Cir. 1997). Nonetheless, the district court observed that the state habeas court "did not end its inquiry there" and that it analyzed the admission in the context of the other testimony presented at trial.  The district court held that the state court's decision could not be said to involve an unreasonable application of federal law because "it is evident that the state habeas court looked at the entire record and found that, because of the other evidence presented to the jury, the absence of a limiting instruction regarding [Coulson]'s admissions to the police did not create a reasonable probability that the result of the proceedings would have been different."[26]  Even with this

---

[26]  The district court considered the state habeas court's findings of fact and stated:

Specifically, in the portion of the findings of fact devoted to the limiting instruction issue[,] the state habeas court recognized that other witnesses testified that [Coulson] had made remarks prior to the murders about his family dying so that he could receive his inheritance, that [Coulson] had previously threatened (possibly in jest) to kill his family, and that he demeaned various family members in conversations with others.  The court also found that [Coulson] had made incriminating statements to [his girlfriend] Jerri Moore, Kenneth Smith, and Jared Althaus.  The state

45

conclusion, the district court also observed that, assuming the state court had employed the wrong standard, the district court "independently concludes that the evidence . . . establishes that Coulson has not satisfied the prejudice prong under Strickland."

Coulson argues here that "[w]hile both [the state habeas court and the district court] purported to review the entirety of the record of Coulson's trial, each court was content to review all of the evidence in the light most favorable to the verdict, just as a reviewing court is directed to do when it conducts an analysis for legal sufficiency." Coulson contends that this type of analysis constitutes an "unreasonable application" of Strickland to the facts of his case, and therefore, he should be afforded habeas relief. We disagree.

It is true that the state habeas court concluded that there was "sufficient evidence" to support Coulson's conviction. Furthermore, we agree with both Coulson and the district court that this is an improper standard under Strickland. This court has held that "the standard for prejudice under Strickland is 'identical to' the standard for materiality under Brady." Felder, 180 F.3d at 214 (quoting Johnson v. Scott, 68 F.3d 106, 109-10 (5th Cir. 1995)); see also Martin, 246 F.3d at 477. And

_____

habeas court also noted that in [Coulson]'s testimony he claimed that the prior statements concerning his admissions were all fabrications.

(Citations to record omitted).

46

"[t]he Supreme Court has warned that the Brady materiality analysis 'is not a sufficiency of evidence test.'" East, 123 F.3d at 239 (quoting Kyles v. Whitley, 514 U.S. 419, 434–35 (1995)). Even so, for the reasons below, we agree with the district court that the state habeas court's discussion of sufficiency of the evidence was not fatal to the state habeas court's decision.

In determining whether there was prejudice, a reviewing court is required to consider the totality of the evidence before the jury. See Johnson v. Scott, 68 F.3d 106, 109 (5th Cir. 1995). Our review of the state habeas court's findings of fact and conclusions of law demonstrates that the state court considered the entirety of the evidence adduced at trial to hold that Coulson "fail[ed] to show that the outcome of the proceeding would have been different if counsel had requested and received a limiting instruction." Considering that the state habeas court evaluated the totality of the evidence before the jury in making its conclusion, we conclude that this was not an objectively unreasonable application of federal law. See 28 U.S.C. § 2254(d)(1). Accordingly, Coulson has failed to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Kutzner, 242 F.3d at 608, and we are precluded from granting a

47

COA to Coulson because he has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).[27]

## VII. CONCLUSION

For the foregoing reasons, the district court's denial of habeas relief is AFFIRMED, and Coulson's application for a certificate of appealability on his limiting-instruction claim is DENIED.

---

[27]  Because we have determined that Coulson has failed to demonstrate prejudice, we need not address <u>Strickland</u>'s deficient performance prong.  <u>See</u> <u>Armstead</u>, 37 F.3d at 210.