**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 99-30585**

_____

**LESLIE DALE MARTIN,**

**Petitioner-Appellant,**

**versus**

**BURL CAIN, Warden,**
**Louisiana State Penitentiary,**

**Respondent-Appellee.**

_____

**Appeal from the United States District Court**
**for the Western District of Louisiana**

_____

March 27, 2001

ON REMAND FROM THE UNITED STATES SUPREME COURT

Before KING, Chief Judge, BARKSDALE, and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Leslie Dale Martin, sentenced to death in Louisiana state court for first degree murder, appealed the denial of his federal habeas application, the district court having granted a certificate of appealability (COA) on two interrelated claims regarding the testimony of the State's key witness concerning Martin's committing the murder in connection with aggravated rape: ineffective assistance of counsel and a **Brady** claim. Applying our court's then-contested standard of review, we affirmed the denial of habeas relief. **Martin v. Cain**, 206 F.3d 450, 461 (5th Cir.), _vacated_, 121 S. Ct. 32 (2000).

That standard of review was rejected subsequently in ***Williams v. Taylor***, 120 S. Ct. 1495 (2000). Concomitantly, concerning the proper standard of review for the case at hand, the Supreme Court granted certiorari, and vacated and remanded for us to consider this case in the light of ***Williams***. ***Martin v. Cain***, 121 S. Ct. 32, 32 (2000).

On remand, and applying the standard adopted in ***Williams***, we **AFFIRM.** Other than those parts of the opinion in which we apply that standard, this opinion closely tracks our previous one.

## I.

On 20 June 1991, Martin went to a bar in Lake Charles, Louisiana, where his companion, Roland, introduced him to the victim. Around 7:30 the next morning, Martin told his work supervisor that he had met a college student, left the bar with her, and woke up alone on Galveston Beach. The supervisor noticed scratches on Martin's forehead, neck, and shoulder that had *not* been there the day before.

When Martin returned to his aunt's home (where he was residing), wearing different clothes from the previous night, and *no* shirt or shoes, his cousin observed scratches on his chest and back, a bite mark on his shoulder, and a tear under his tongue. Martin explained he had fought a "country boy" at the bar.

That same morning, Martin related to another, Rushing, he thought he may have killed someone the previous night, and asked

2

Rushing for an alibi. Although Rushing refused, Martin confided that the victim had threatened to report him for rape. Martin mentioned a shed in Iowa, Louisiana, and stated he had choked the victim with a rope, cut her throat, dug her eyes out, and jumped up and down on a wooden board placed on her neck. Subsequently, Rushing testified that Martin, who had served several years of a ten-year sentence for sexual battery, told him (Rushing) "he didn't want to be turned in for rape again".

Rushing did *not* believe Martin's story; but, nine days later, when he learned the victim had been missing since leaving the bar, he provided the information to police. During a search of sheds in the Iowa area, authorities discovered the victim's decomposing body, with a rope around her neck, and a wooden board containing human blood nearby. There was little forensic evidence. A tampon taken from the body tested negative for seminal fluid; but, a forensic expert testified that, due to decomposition, the test could be a "false negative".

Under Louisiana law, *first degree murder* includes "killing ... a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... *aggravated rape*...." LA. REV. STAT. ANN. § 14:30(A)(1) (emphasis added). Rape is aggravated "[w]hen the victim resists the act to the utmost, but whose resistance is overcome by force". LA. REV. STAT. ANN. § 14:42(A)(1).

Trial testimony indicated there may have been a time lapse between the charged rape and the charged murder. On direct appeal, the Louisiana Supreme Court noted: "when the sexual crime and the homicide 'formed one continuous transaction'", the elements of § 14:30(A)(1) are met. *State v. Martin*, 645 So. 2d 190, 194 (La. 1994) (quoting *State v. Copeland*, 530 So. 2d 526, 540 (La. 1988) (holding that raping victim, driving across parish line, and then committing murder, was "one continuous transaction")). In any event, Martin confirmed at oral argument here that he is claiming there was *no* rape, *not* that a time lapse between the charged rape and charged murder would preclude the capital conviction.

Three inmates who had been incarcerated with Martin after his arrest — Williamson, Fontenot, and Sweet — each testified, in varying detail, that: Martin told them he had sexual relations with the victim; she accused him of rape; and he killed her, because he did *not* want to return to prison. But, *only* Sweet's testimony established *aggravated rape*:

> Q: [PROSECUTOR] You said that he didn't say where they went, it was to be together, but what happened then?
>
> A: Well, he said that he wanted to have sex with her.
>
> Q: Uh-huh (yes).
>
> A: But she refused because her ministration [sic] was on.
>
> ....

4

Q:    What did he do then?

A:    He said he had to have her.

Q:    Okay.

A:    So he overpowered her.

Q:    He overpowered her.  Did he tell you how he overpowered her?

A:    He struggled with her.

Q:    He struggled with her?

A:    Yes, sir.

Q:    *Did he tell you if she fought back?*

A:    *Yes, she did.  She resisted.*

Q:    *And what happened then?*

A:    *He overpowered her and had sex with her.*

      ....

Q:    ... Did he tell you what happened next?

A:    Yes.  He said that after he was finished she became hysterical and went to threatening him about she was going to tell the police, and that he was wrong for what he did.

Q:    She was hysterical at the time according to him?

A:    Yes, sir.

      ....

Q:    What did he think then?  Did he tell you what he was thinking about then?

A:    He said he was thinking about going back to the prison.

5

Q: Okay.

A: And he said he wasn't going back to prison for nobody.

Q: What happened next?

A: He said his mind clicked and he began to choke her.

....

Q: Did he tell you if she was fighting back?

A: Yes, sir, she was struggling.

Q: While he was trying to kill her?

A: Yes, sir.

(Emphasis added.)

In May 1992, a jury found Martin guilty of first degree murder. After a penalty phase hearing, it found he should be sentenced to death, as a result of finding the following aggravating circumstances: the aggravated rape; and the offense was committed in an especially heinous, atrocious, and cruel manner.

On direct appeal, Martin contended, *inter alia*, that the State, at most, proved forcible, *not aggravated*, rape. **Martin**, 645 So. 2d at 194. The former occurs when "the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would *not* prevent the rape". LA. REV. STAT. ANN. § 14:42.1 (emphasis added). The difference between aggravated and forcible

6

rape is "the degree of force" and "the extent of resistance". *Martin*, 645 So. 2d at 195 (citing *State v. Parish*, 405 So. 2d 1080 (La. 1981)).

The Louisiana Supreme Court affirmed Martin's conviction and death sentence, based, *inter alia*, on the victim's small size and Sweet's testimony that the victim "refused [Martin's] advances, that he struggled with her and she fought back, and that he overpowered her". *Id*. (The sufficiency of the evidence for aggravated rape is *not* one of the certified issues here.) The Supreme Court of the United States denied certiorari. *Martin v. Louisiana*, 515 U.S. 1105, *reh'g denied*, 515 U.S. 1179 (1995).

In April 1997, the state district court, having held a two-day evidentiary hearing that January, denied Martin's application for post-conviction relief. *State v. Martin*, No. 9459-91. The claims certified for appeal by the federal district court are the same as two of the many rejected by the state district court.

Martin filed a federal habeas application, presenting 17 claims, in November 1998. The district court, adopting the detailed and comprehensive report and recommendation of the magistrate judge, denied relief. Subsequently, it granted a COA on two claims regarding Sweet's testimony: whether Martin received ineffective assistance of counsel; and whether the State violated its disclosure obligation under *Brady v. Maryland*, 373 U.S. 83 (1963).

II.

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32, 110 Stat. 1214 (AEDPA), applies because, subsequent to its enactment, Martin filed his federal habeas application. *Green v. Johnson*, 116 F.3d 1115, 1119-20 (5th Cir. 1997). Under AEDPA, a COA, granted by a circuit justice or judge, is required in order for us to review a habeas claim. 28 U.S.C. § 2253; *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997). As noted, two issues were certified: *Brady*; and ineffective assistance of counsel.[1]

Under AEDPA, habeas relief is *not* available to a state prisoner

> with respect to any claim that was *adjudicated on the merits* in the State court proceedings *unless* the adjudication of the claim—
>
> (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the

---

[1]In his brief, Martin requests "a COA with respect to the full range" of the claimed counsel deficiencies and *Brady* violations, as presented in his habeas petition. *See United States v. Kimler*, 150 F.3d 429, 430 (5th Cir. 1998) (noting that we may certify issues *not* certified by the district court, if petitioner explicitly requests it). But, because these requests are *not* briefed, we will *not* consider them. *See, e.g., Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir. 1993) ("[q]uestions posed for appellate review but inadequately briefed are considered abandoned").

8

facts in light of the evidence presented in
the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). Therefore, "pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)". *Corwin v. Johnson,* 150 F.3d 467, 471 (5th Cir.), *cert. denied,* 525 U.S. 1049 (1998). Because this appeal involves mixed questions of law and fact, § 2254(d)(1)'s standards apply. *See* *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir.) (whether State must disclose evidence under *Brady* "is a mixed question of law and fact"), *cert. denied*, 527 U.S. 1056 (1999); *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998) (ineffective assistance claims "present a mixed question of law and fact"), *cert. denied*, 526 U.S. 1148 (1999).

In his appellate brief, Martin claims the state district court's concluding, on post-conviction review, that "the standard for a *Brady* violation ha[d] *not* been met" (emphasis added), was *not* a "full and fair adjudication", and therefore, subpart (d)(1) should *not* apply. At oral argument here, however, Martin acknowledged its applicability. Accordingly, he appears to have abandoned this contention. In any event, as did the district court, we find this contention meritless.

As quoted, pursuant to § 2254(d)(1), there are two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim that was adjudicated on the merits in state

court: if the state court decision was either "contrary to ... clearly established Federal law, as determined by the Supreme Court" or "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court". 28 U.S.C. § 2254(d)(1) (emphasis added).

*Williams* interpreted § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. 120 S. Ct. at 1519-21. A state court decision is "*contrary to*" clearly established Supreme Court precedent if the state court: "applies a rule that *contradicts* the governing law set forth in [Supreme Court] cases"; or "confronts a set of facts that are *materially indistinguishable* from a decision of [the Supreme] Court and nevertheless arrives at a *result different* from [Supreme Court] precedent". *Id.* at 1519-20 (emphasis added). On the other hand, a state court decision falls within the "unreasonable application" clause when it *unreasonably* applies Supreme Court precedent to the facts. *Id.* at 1521.

The state court decision at issue was *not* "contrary to" clearly established Supreme Court precedent because: it did *not* apply a rule contradictory to applicable Supreme Court precedent; and it did *not* reach a result, under "materially indistinguishable" facts, in conflict with such precedent. Accordingly, we focus on § 2254(d)(1)'s "unreasonable application" clause: whether the state district court *unreasonably* applied Supreme Court precedent to the facts.

10

*Williams* instructs: "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively reasonable*". *Id.* at 1521 (emphasis added). We *cannot* reverse the denial of habeas relief simply by concluding that the state court decision applied clearly established federal law *erroneously*. *Id.* at 1522. Instead, we must conclude that such application was also *unreasonable. Id.*

A criminal defendant may establish a *Brady* violation, affecting his constitutional right to due process, by showing the prosecution suppressed favorable evidence, *including impeachment evidence*, *material* to his guilt. *Jackson v. Johnson*, 194 F.3d 641, 648-49 (5th Cir. 1999), *cert. denied*, 529 U.S. 1027 (2000). *See United States v. Bagley*, 473 U.S. 667, 682 (1985). "The State's good or bad faith" in depriving the defendant of exculpatory evidence "is irrelevant", *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997) (citing *United States v. Agurs*, 427 U.S. 97, 110 (1976)), *cert. denied*, 522 U.S. 1120 (1998); and the reviewing court must assess "the cumulative effect" of the nondisclosure. *Hughes v. Johnson*, 191 F.3d 607, 629 (5th Cir. 1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)), *cert. denied*, 528 U.S. 1145 (2000).

11

"[E]vidence is *material* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"; and such "'reasonable probability' is a probability sufficient to undermine confidence in the outcome". ***Bagley***, 473 U.S. at 682 (emphasis added). Therefore, to succeed on his ***Brady*** claim, Martin had to "show[] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict". ***Kyles***, 514 U.S. at 435; ***Hughes***, 191 F.3d at 629.

***Brady***'s "materiality" standard "is identical to" the prejudice standard Martin had to satisfy to prevail on his ineffective assistance claim. ***Johnson v. Scott***, 68 F.3d 106, 109-10 (5th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996). For the latter, he had to likewise demonstrate "a reasonable probability that, but for counsel's unprofessional errors", the verdict would have been different. ***Strickland v. Washington***, 466 U.S. 668, 694 (1984); ***Davis v. Johnson***, 158 F.3d 806, 812 (5th Cir. 1998), *cert. denied*, 526 U.S. 1074 (1999). (Because, as discussed *infra*, the requisite *prejudice* is lacking for the ineffective assistance claim, we need *not* address the other prong of the ***Strickland*** test — deficient performance *vel non* by counsel.)

12

A.

For the two interrelated, certified claims, Martin contends: contrary to *Brady*, the State failed to produce, and his counsel, due to inadequate investigation — contrary to *Strickland* — failed to discover[2], substantial impeachment evidence relative to Sweet — in his pre-trial video statement, cell location history, and criminal record.

1.

On 17 July 1991, nine months before trial, and approximately two weeks after Martin's arrest, Sweet provided for the sheriff's office a videotaped statement about Martin. That September, Martin requested witness statements and any *Brady* material. Responding that there was *no Brady* material, the State refused to disclose the statements.

In May 1992, 11 days before trial, Martin filed a supplemental motion for exculpatory evidence, again requesting discovery, or an *in camera* inspection, of certain inmate statements, including Sweet's. At the motion hearing, the State objected to disclosure, again claiming *no Brady* material. Based on that representation, the motion was denied.

---

[2]Martin's trial counsel, Pitre and Williams, were appointed to replace the public defender on 30 March 1991, 42 days before trial. At the state post-conviction evidentiary hearing, Williams testified that he spent 60 hours, at most, on the case; the majority of Pitre's time, as lead counsel, was apparently spent seeking a continuance. *See Martin*, 645 So. 2d at 197 (discussing denial of continuance).

13

On the other hand, before the State rested in the guilt-innocence phase (but after the inmate-witnesses had testified), the trial court *did* offer Martin's counsel an opportunity to inspect the requested statements. Counsel asked the judge to review the statements instead.

The judge did so. At a bench conference, he related that, in the video, Sweet stated that Martin told him he and the victim had been drinking, and "they had sex but she didn't want to do it, but he was all worked up and he overpowered her and she was hysterical". The judge also reviewed and related portions of the statements by Fontenot, Williamson, and three inmates who did *not* testify. The judge reminded Martin's counsel that, if they used portions of the statements, the State could use the rest.

Again, only Sweet's testimony supported *aggravated* rape. Martin contends that this *late disclosure*, and his counsels' failure to *independently review* the statements, prejudiced his defense, asserting that, during closing arguments, the prosecutor "compounded" the ***Brady*** violation by using Sweet's pre-trial statement, *not* produced to Martin, to strengthen Sweet's credibility.

Sweet and Martin became reacquainted in July 1991 when Martin, having recently arrived at the jail, reminded Sweet they had known each other previously. They were in the same jail section that July (the offense was in late June) when Sweet gave his video

14

statement, and thereafter, becoming cell mates later that summer, from 31 August to 4 September.  Martin contends that the following differences between Sweet's pre-trial statement and his trial testimony could have been used to impeach Sweet.

First, Sweet testified that Martin told him details of the murder; in the statement, that Martin told him only that he "grabbed [the victim] with both hands around the neck ... [and] he killed her then", and "didn't get into details".

Second, without mentioning any earlier consensual activity by the victim, Sweet testified that Martin said the victim refused to have sexual relations because of her "ministration" [sic]; in the statement, that Martin "was all worked up because [the victim] had been kissing on him and hugging all on him and he was aroused and she didn't want to go through with it ... for some unknown reason".

Third, Sweet testified that Martin told him his (Martin's) friend, "Pinky" (Rushing's nickname), "turned him in"; in the statement, that Martin never mentioned the name of the informant. (Martin notes that Sweet also related that the same friend was with Martin when he met the victim, but trial testimony established it was Roland, *not Rushing*.)

Fourth, and finally, Sweet testified that Martin never told him the victim was intoxicated or that he had been drinking; in the statement, that Martin said "they had been drinking".

15

The discrepancies between Sweet's statement and testimony are favorable to Martin, because they could have been used to attempt to impeach Sweet's credibility. And, because Sweet was the "key witness on an essential issue", *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989), then, arguably, the evidence was *material*. *See* *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994) (finding withheld evidence material, relative to testimony "essential" to defendant's conviction), *cert. denied*, 513 U.S. 1091 (1995).

Martin also maintains his counsel failed to properly cross-examine Sweet when, in response to a question by Martin's counsel, Sweet stated: "I don't know if [Martin] said he raped her or had sex with her". Martin's counsel did *not* question Sweet further about this inconsistency.

The State responds that the differences in Sweet's statement and his testimony can be explained by the fact that, when Sweet gave the statement, he and Martin had only been in the same jail about two weeks, and Martin could have told Sweet the details later, when they became cell mates. It asserts that the video did *not* contain **Brady** material, *until* Sweet gave the somewhat differing testimony at trial; notes that it *did disclose* his statement during trial; and maintains that his testimony is reliable because, about eight years prior to their joint incarceration, Sweet and Martin had formed a friendship in a juvenile facility.

16

On post-conviction review, the state district court concluded: "A comparison of the video statement and trial testimony of Sweet fail[ed] to reveal inconsistencies *sufficient* to possibly impeach". (Emphasis added.) It also concluded: because Sweet's referenced un-followed-up-testimony was made in the presence of the jury, there was *no* prejudice.

Upon review of the record, we *cannot* say the state court's application of federal law was incorrect, much less *unreasonable*. Martin's counsel could have impeached Sweet generally with his prior inconsistent statements (in the pre-trial statement and his testimony on cross). But, what is *material* (reasonable probability that trial's result would have been different) is Sweet's description of the victim's resistance and that resistance being overpowered by Martin. In that regard, Sweet's statement and testimony are consistent.

2.

Martin asserts that, because of inadequate investigation, it was only post-trial that his counsel learned Sweet and Martin were *not* in the same cell in July 1991, when Sweet claimed Martin confessed; and, in fact, were cell mates only much later, that August-September, and then only for four days. He contends: although Sweet's account of his (Martin's) confession – *e.g.*, Martin's pacing the floor of their cell at night on several occasions – sounds rational had it occurred over the "about two

17

months" Sweet testified he and Martin shared a cell, it is *not* compatible with a four-day time span. Martin maintains the state district court overlooked the significance of Sweet's testimony that he was actually Martin's cell mate when Martin confessed, only to him, the details necessary to establish aggravated rape; and Martin points out that, in its closing argument, the State used Sweet's "cell mate" status to persuade the jury Sweet's account was believable.[3]

Sweet and Martin were in the *same cell* only from 31 August to 4 September. The state district court found, however, they were in the *same "pod"* from 9 July through 25 August 1991, with "access to each other daily from about 5:00 a.m. until 10:00 or 11:00 p.m".

In the light of their extensive opportunities to visit, and of Sweet's testimony that Martin "went into details on a different occasion", counsels' failure to discover Sweet's cell location history does *not* translate into a *reasonable probability* that, but for that failure, the verdict would have been different. As with the first issue, the state district court did *not unreasonably* apply federal law.

---

[3]Martin contends that the state district court's rejection of this issue was, pursuant to § 2254(d)(2), "based on an unreasonable determination of the facts...." We find this claim — which is *not* included in the COA, *see* note 1, *supra* — without merit, in the light of the fact that, after a two-day evidentiary hearing, that court was fully aware of the time period in which Martin and Sweet were in the same section, and when they were cell mates, as discussed *infra*.

3.

Martin maintains also he was prejudiced by the State's failure to disclose, and counsels' failure to discover (and utilize for impeachment), Sweet's full criminal record, which included several prior convictions (for theft and "unauthorized use of a movable", and for simple assault), as well as pending charges (Sweet absconded with over $500 in parish funds given him for use as an undercover narcotics informant, and threatened to kill the officer who subsequently arrested him). In particular, Martin's counsel was unable to counter Sweet's trial testimony that he had *only one* criminal offense — for cocaine distribution.

The record indicates, and the state district court determined: at a pre-trial hearing, the State provided Sweet's criminal record to Martin's counsel. At a hearing on Martin's new trial motion, however, Martin's counsel testified that the State provided only "a typewritten list of some charges against one inmate" (unidentified in the record).

The state district court noted: Sweet testified at trial in his prison uniform; the jury was aware he had one prior felony conviction and was currently in prison; and evidence of the then pending charges, admissible only to show bias or prejudice, would *not* have been admitted, because Sweet denied any promise by the State of leniency or a plea bargain. As a result, it held that Martin had *not* shown the requisite prejudice.

19

For this issue, as with the first two, the state court decision was *not* outside the standard of § 2254(d)(1), as defined in **Williams**.

B.

As he did in district court, Martin asserts that, cumulatively, the referenced suppressed or undiscovered impeachment evidence translates into the requisite prejudice. He contends: the only other evidence of aggravated rape, the scratches and other physical injuries (bite mark on shoulder and tear under tongue) observed by witnesses, could have been caused by his claimed fight at the bar. (As noted, according to Martin's cousin, Martin said the injuries resulted from a fight there with a "country boy".)

The State responds that, in addition to Sweet's testimony, other evidence supported finding aggravated rape: Martin's physical injuries; the removal of the victim's clothing; and the logical inference that, had the sexual relations been consensual, Martin would have had *no* reason to kill her. The State acknowledges "Sweet is the only State witness who testified that [Martin] *told him* he raped the victim" (emphasis added); but, it claims Williamson, Fontenot, and Rushing's testimony also supported aggravated rape because they "relayed the last words of [the victim]" – that Martin "took advantage of her" (Williamson) or raped her (Fontenot and Rushing).

20

Martin replies that this contention by the State — the victim "spoke through" Martin and then through the inmates — is hearsay within hearsay, and *cannot* be used to establish aggravated rape, because such evidence is too unreliable. In support, Martin cites **State v. Lubrano**, 563 So. 2d 847, 849 (La. 1990) ("[w]here the state's case rests *entirely* on hearsay evidence ... counsel's failure to object does not necessarily foreclose inquiry into the reliability of the result") (emphasis in original); and **State v. Allien**, 366 So. 2d 1308, 1312 (La. 1978) (reversing conviction where "unobjected to hearsay" was "exclusive evidence of a defendant's guilt"). Martin contends: by taking the victim's alleged statements out of context, the State ignores the fact that such testimony indicates, at most, the victim thought Martin had taken advantage of her intoxication.

We find, consistent with Martin's assertion at oral argument, that this hearsay issue, *even if raised previously*, was apparently *not* a basis for the decisions by the Louisiana Supreme Court on direct appeal, or by the state district court or federal district court on post-conviction review. Accordingly, we decline to consider this (the State's) contention.

To demonstrate the requisite prejudice as a result of the claimed cumulative error, Martin points to the magistrate judge's statement, in his report and recommendation, that, under a *de novo* review, he might have reached a different conclusion than did the

state district court.  However, as discussed, this is *not* the standard of review: "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law". ***Williams***, 120 S. Ct. at 1522 (emphasis in original).

Concerning this cumulative-error-issue, and as noted for each of the earlier issues, we conclude that the state district court did *not unreasonably* apply federal law to the facts.  Sweet's testimony, with the exception of that about the aggravated nature of the rape, was corroborated by a number of other witnesses and other evidence, and Sweet's testimony concerning the aggravated nature of the rape was, to some extent, corroborated by Martin's visible physical injuries shortly after the murder.

III.

For the foregoing reasons, and consistent with the result reached in our first (vacated) opinion, the denial of habeas relief is

***AFFIRMED.***

22