**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

—————————

No. 01-21013

—————————

ALLEN WAYNE JANECKA,

Petitioner - Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
For the Southern District of Texas

August 1, 2002

Before JONES, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Allen Wayne Janecka, a Texas death row inmate, seeks a certificate of appealability ("COA")

to challenge the district court's denial of his 28 U.S.C. § 2254 petition for habeas corpus relief.

Because Janecka has failed to make a substantial showing of the denial of a constitutional right with

respect to any of his claims, we deny the COA.

Janecka has been sentenced to death for the murder for remuneration of fourteen-month-old

Kevin Wanstrath. Kevin and his parents, Diana and John Wanstrath, were found dead in their home on July 6, 1979 by a neighbor—all died of gunshot wounds to the head. The coroner initially ruled that Diana murdered her husband and son before committing suicide, but no gun was found at the crime scene. Officer Johnny Bonds of the Houston Police Department continued to investigate the case for the next year-and-a-half, focusing on Diana's brother, Markham Duff-Smith, who stood to gain a substantial inheritance upon the family's death. During his investigation, Officer Bonds uncovered evidence suggesting that Duff-Smith hired Walt Waldhauser to murder the family, and that Waldhauser in turn hired Janecka to commit the murders.

In July 1980, Janecka left Texas and moved to Georgia to live with his girlfriend, Karen Holder, and her mother. A few months later, Houston Detective Dan McAnulty traveled to Georgia in order to locate Janecka. Unable to locate Janecka, Detective McAnulty spoke with Holder instead, who was then living with her father. Holder had moved from her mother's to her father's home after Janecka left Georgia. At some point during their conversation, Holder turned over to Detective McAnulty Janecka's .22 caliber pistol and a can of mace, both of which were used in the Wanstrath murders. Around the same time Detective McAnulty was in Georgia, Janecka was arrested in Texas on warrants for another homicide and for arson.

Thereafter, while returning to his cell from a canceled line-up, Janecka overheard Detective McAnulty mention to another officer that he had been in Georgia. Janecka asked Detective McAnulty how everyone in Georgia was doing. Detective McAnulty responded that everyone was fine. Janecka then began asking questions about his investigation in Georgia. Detective McAnulty told him that he believed he had found the gun and a can of mace used in the murders. During the next twenty-four hours, Janecka made three statements confessing to the murder of Kevin Wanstrath.

-2-

Janecka also told police that he only participated in the Wanstrath murders because he was afraid that Waldhauser, who Janecka claims had mafia connections, would have killed him if he did not do so.

Based on the testimony of several witnesses, the murder weapon, and Janecka's incriminating statements, a jury convicted Janecka in 1993 of the murder for remuneration of Kevin Wanstrath and sentenced him to death.[1] The Texas Court of Criminal Appeals (TCCA) affirmed his conviction and sentence on direct appeal, and the United States Supreme Court denied his petition for writ of certiorari. Janecka sought collateral review of his conviction in state court, which both the state trial court and the TCCA denied. Janecka then filed a § 2254 petition for habeas relief in district court and requested an evidentiary hearing. The district court denied habeas relief on all fourteen of Janecka's habeas claims and rejected his request for a hearing.[2] Janecka now seeks a COA from this court to appeal four of these claims.

# I

In order to obtain a COA for any of his claims, Janecka must make a "substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). A "substantial showing" requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further." *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). "Any doubts as to whether a COA should issue must be resolved in [Janecka's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th

---

[1]Janecka was convicted in 1993 after a retrial. His first conviction was vacated because of an error in the original indictment.

[2]Janecka also filed a motion in district court to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e), which the district court denied.

Cir. 2000). The severity of Janecka's prescribed penalty also colors our consideration of whether he has met his "substantial showing" burden. *Hill v. Johnson*, 210 F.3d 481, 484 (5th Cir. 2000). Thus, because this case involves the death penalty, we are especially careful in our analysis of Janecka's claims.

In addition, in assessing whether Janecka is entitled to a COA, "we must keep in mind the deference scheme laid out in 28 U.S.C. § 2254(d)." *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Pure questions of law and mixed questions of law and fact raised in habeas petitions are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Under the standard in § 2254(d)(1), federal courts can only issue a writ if the decision of the state court was either (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court decision constitutes an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.

## II

Janecka first seeks a COA on his claim that his Fourth Amendment rights were violated by the admission of "tainted fruits" into evidence at his murder trial. Specifically, Janecka claims that

Detective McAnulty recovered the murder weapon and the can of mace from Karen Holder during an unlawful search of her father's residence because he did not have a search warrant and did not receive consent to search the residence. As a result, Janecka contends, the gun, the can of mace, and all information obtained as a result of the unlawful search—including his three confessions—should have been excluded from evidence during trial. Because, Janecka argues, jurists of reason would find debatable the district court's denial of this claim, he contends that he is entitled to a COA on this issue.

We generally are barred from reviewing Fourth Amendment claims on habeas review. *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone v. Powell*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. This court has since interpreted an "opportunity for full and fair litigation" to mean just that: "an opportunity." *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978). "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." *Id.*

Janecka argues that his Fourth Amendment claim based on an unlawful search is not barred by *Stone* because he was not afforded an opportunity for full and fair litigation on this particular claim. Specifically, Janecka maintains that he diligently raised his unlawful search claim in both the state trial and appellate courts, but that both courts failed to sufficiently address the merits of this claim. After carefully reviewing the record in this case, we conclude Janecka was afforded sufficient

opportunity for full and fair litigation of his Fourth Amendment unlawful search claim to trigger the *Stone* bar.

First, Janecka had an opportunity to raise his unlawful search claim in a pre-trial motion to suppress the gun, the can of mace, and the confessions.[3] The fact that Janecka failed to take advantage of this opportunity does not render the *Stone* bar inapplicable to this claim. *Id.* at 1193 (stating that the *Stone* bar applies "whether or not the defendant avails himself of th[e] opportunity [for full and fair litigation in state court]"). Janecka also was able to object at trial to the admission of evidence obtained as a result of the allegedly unlawful search. Indeed, it appears from the trial transcript that Janecka made such an objection, at least with respect to the introduction of the gun and the can of mace.[4] The fact that Janecka may disagree with the district court's decision to overrule his objection is not sufficient to overcome the *Stone* bar. *See Swicegood v. Alabama*, 577 F.2d 1322, 1324 (5th Cir. 1978) (holding that the *Stone* bar applies despite an error by the state court in deciding the merits of a Fourth Amendment claim).

Second, Janecka was afforded sufficient opportunity to litigate his Fourth Amendment claim before the TCCA. On appeal, Janecka raised three Fourth Amendment claims—the present claim of unlawful search and two additional claims of unlawful arrest. The TCCA addressed all three claims in the same section of its opinion, concluding that none of Janecka's arguments had merit. Janecka now argues that the TCCA's consideration of his Fourth Amendment unlawful search claim was

---

[3]Janecka did file a pre-trial motion objecting to the admission of the gun, the can of mace, and his confessions, but based on different grounds.

[4]At trial, Janecka's counsel asked Detective McAnulty whether he had a search warrant or consent to search Karen Holder's residence. After Detective McAnulty answered negatively to both questions, Janecka's counsel objected to the introduction into evidence of the gun and the can of mace.

insufficient because the court discussed in detail the reasons for rejecting his unlawful arrest arguments, but failed to specify its reasons for denying relief on his unlawful search claim.

Even assuming Janecka is correct that the TCCA overlooked his unlawful search claim (which was only one of 48 claims raised), the *Stone* bar still applies to this claim for two reasons. To begin, we have previously held that, absent additional allegations that state processes routinely or systematically are applied in such a way as to prevent the actual litigation of Fourth Amendment claims, mistakes that thwart the presentation of Fourth Amendment claims do not render the *Stone* bar inapplicable. *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980) (holding that the *Stone* bar applied even though state court refused to review a Fourth Amendment claim based on the erroneous belief that it had already been raised and addressed). *Cf. Scott v. Maggio*, 695 F.2d 916, 919-20 (5th Cir. 1983) (assuming, without deciding, that the *Stone* bar did not apply where state court failed to address a properly raised Fourth Amendment claim on direct appeal). Janecka fails to make such additional allegations here. Moreover, Janecka failed to take advantage of state procedures that could have corrected the TCCA's alleged error. Although Janecka filed a motion for rehearing of the court's opinion, he did not complain in his motion that the court failed to sufficiently address his unlawful search claim. Janecka also declined to raise the unlawful search claim in his state habeas application, despite his alleged belief that it was not resolved by the TCCA's opinion on direct appeal.

Additionally, even if Janecka's unlawful search claim was not barred by *Stone*, he is still not entitled to a COA on this claim because it clearly fails on the merits. First, Janecka cannot show that he had a "reasonable expectation of privacy" in the gun because he left it in the care of Karen Holder. *See Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980) (holding that plaintiff did not have a

reasonable expectation of privacy in drugs stored in acquaintance's purse).[5]  Second, there is no

evidence in the record that any "search" took place.  According to Holder, she handed the gun and

the mace to Detective McAnulty voluntarily while he was interviewing her.[6]  Third, even if a "search"

took place, Holder implicitly consented to the search by voluntarily turning over the gun.

In sum, jurists of reason would not find debatable the district court's denial of Janecka's

Fourth Amendment claim.  The district court also did not err when it denied Janecka's request for

an evidentiary hearing on this claim because the claim can be resolved on the undisputed facts in the

record.

### III

Janecka next seeks a COA on his claim that the TCCA violated his right to due process when

it refused to apply Texas's former *Palafox* or "voucher" rule in his direct appeal.[7]  Under Texas's

former *Palafox* rule, if the State introduced a defendant's confession, which contained both

incriminating and exculpatory information, and the State failed to disprove the exculpatory

---

[5]Janecka argues that he maintained a reasonable expectation of privacy because a bailment was created when he left the gun with Karen Holder.  *See United States v. Johns*, 707 F.2d 1093, 1100 (9ᵗʰ Cir. 1983), *rev'd on other grounds*, 469 U.S. 478 (1985) (contrasting the "precipitous" bailment arrangement in *Rawlings* with the formalized bailment arrangement in this case and holding that a reasonable expectation of privacy existed).  Even if Janecka could rely on the creation of a bailment to establish a reasonable expectation of privacy initially, the length of time the gun was left in the possession of Holder and the fact that she moved to a different house while Janecka was away both defy the continued existence of that expectation.

[6]At trial, Karen Holder testified that she was not forced or pressured into turning the gun and the can of mace over to Detective McAnulty.

[7]We note that this claim appears to have been added to Janecka's amended § 2254 petition after the 1-year statute of limitations expired.  28 U.S.C. § 2244(d)(1) ("A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.").  Because this is a death penalty case and the limitations period was exceeded by at most three days, we assume *arguendo* that this claim was not time-barred.

component, then a defendant could successfully move for a judgment of acquittal. *Palafox v. State*, 608 S.W.2d 177, 181 (Tex. Crim. App. 1980). Although Janecka concedes that Texas abolished the *Palafox* rule in 1986, he maintains that due process requires its application to his case because the rule afforded him a substantive defense to capital murder at the time the offense was committed. Specifically, Janecka contends that, when making his three confessions, he asserted a defense of duress that the government had the burden to disprove at trial—that he only participated in the Wanstrath murders because he was afraid of Walt Waldhauser and his alleged mafia connections. As a result, Janecka reasons that the TCCA's retroactive abrogation of the *Palafox* rule is the equivalent of a judicially-created "ex post facto law" prohibited by the Due Process Clause.[8]

Janecka's due process claim rests on the assumption that the Due Process Clause places identical limits on the decisionmaking power of the judiciary as those placed on the legislature by the Ex Post Facto Clause.[9] Janecka then relies on the Supreme Court's ex post facto jurisprudence, and in particular *Calder v. Bull*, 3 U.S. 386 (1798), to define those due process limitations. In *Calder*

---

[8]We are not aware of any cases, and Janecka does not cite any, in which the *Palafox* rule was used to shift the burden of proof on a defendant's affirmative defense to the State. Rather, *Palafox* has been construed to require the State to disprove exculpatory information negating an element of the offense. *See, e.g., Ibanez v. State*, 749 S.W.2d 804, 812 (Tex. Crim. App. 1986) (holding that *Palafox* required acquittal because State failed to disprove beyond a reasonable doubt defendant's exculpatory statement relating to intent). For purposes of this opinion, we assume *arguendo* that Janecka correctly describes the effect *Palafox* would have if applied in his case.

[9]The Ex Post Facto Clause provides that "[n]o state shall . . . pass any . . . ex post facto law." U.S. CONST. art. I, § 10, cl.1. Although the text of the Ex Post Facto Clause makes clear that it only limits the powers of legislatures, the Supreme Court has acknowledged a similar limitation on the power of the judiciary to render decisions that retroactively criminalize previously legal conduct. *Mark v. United States*, 430 U.S. 188, 191 (1977) (holding retroactive application of Supreme Court case violated defendants' due process rights because it punished conduct that had been considered innocent under previous case law); *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) (holding that "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law" and is prohibited by the Due Process Clause).

*v. Bull*, the Supreme Court interpreted the Ex Post Facto Clause to prohibit four categories of legislative enactments:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390. Janecka argues that the TCCA's retroactive abrogation of the *Palafox* rule violated the Due Process Clause because it had the same effect as a legislative enactment falling within *Calder*'s fourth category in that it shifted the burden with respect to his duress defense to the prosecution.

When reviewing Janecka's claim on direct appeal, the TCCA rejected Janecka's assumption that the Supreme Court had incorporated wholesale *Calder*'s four categories into due process limitations on the retroactive application of judicial decisions. Specifically, the TCCA concluded as follows:

> It is true the Supreme Court has held that retroactive application of an unforeseeable judicial construction of a statute, or a sudden, unanticipated change in a court-made rule, may violate due process in much the same way that retroactive application of new or modified penal provisions violates the Ex Post Facto Clause. *But the gravamen of this due process guarantee is "fair warning" to the defendant that his conduct was criminal at the time he engaged in it.* Insofar as the Supreme Court has yet said, the Due Process Clause of the Fourteenth Amendment does not speak to the fairness, *vel non*, of retroactively lifting a burden of production of evidence from the shoulders of the State. And all the *Palafox* rule did, after all, was to impose a burden to produce evidence to refute any exculpatory matter that is contained in a confession admitted, and hence "vouched for," by the State. There is no indication the Supreme Court would regard the abandonment of this increased burden of production in any way to implicate considerations of "fair warning" about whether specific conduct is criminal.

*Janecka v. State*, 937 S.W.2d 456, 461 (Tex. Crim. App. 1996) (emphasis added) (internal citations

omitted). Janecka now argues that the TCCA's decision rejecting his due process claim was "contrary to" clearly established federal law as determined by the Supreme Court because it ignored *Calder*'s fourth category. We disagree.

At the time of the TCCA's 1996 decision in Janecka's case, the Supreme Court had not yet addressed the question of whether the limitation stated in *Calder*'s fourth category extended to the judiciary. The Supreme Court had, however, recently issued a decision that called into question the viability of the fourth category of *Calder*, even as applied to the legislature. In 1990, the Supreme Court had applied an alternative definition of ex post facto laws in *Collins v. Youngblood* that omitted *Calder*'s fourth category. 497 U.S. 37, 42-43 (1990).[10] In doing so, the Court suggested that the omission of *Calder*'s fourth category from the definition of ex post facto laws was more "faithful to our best knowledge of the original understanding of the Ex Post Facto Clause." *Id.* at 43. According to the Court in *Youngblood*, not all laws that "alter [] the situation of a party to his disadvantage" or "deprive him of a substantial right involved in his liberty" violate the Ex Post Facto Clause. *Id.* at 47–52. In light of *Youngblood* and the absence of any Supreme Court cases extending the limitation stated in *Calder*'s fourth category to the judiciary, we conclude that the TCCA's 1996 decision was not "contrary to" clearly established federal law as it existed at that time. *See Proctor v. Cockrell*, 283 F.3d 726, 735 (5th Cir. 2002) (holding on materially indistinguishable facts that TCCA's denial of petitioner's due process claim was not contrary to Supreme Court precedent as it existed in

---

[10]In *Youngblood*, the Court endorsed the following definition of an ex post facto law first used by the Court in *Beazell v. Ohio*, 269 U.S. 167 (1925): "any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed." *Collins*, 497 U.S. at 42 (quoting *Beazell*, 269 U.S. at 169-70).

-11-

1998).[11]

Anticipating this argument, Janecka relies principally on the Supreme Court's recent decision in *Carmell v. Texas* as evidence of the continued viability of *Calder*'s fourth category, even after *Youngblood*. *Carmell v. Texas*, 529 U.S. 513 (2000). In *Carmell*, the Supreme Court invalidated the TCCA's retroactive application of a new statute that changed the amount of testimony required to convict a sex offender, in some cases requiring less corroborating evidence than previously needed for conviction. *Id.* at 516-20. Because the new statute altered the rules of evidence and required less or different testimony than the law required at the time the offense was committed, the Court held that the new statute constituted an impermissible ex post facto law under *Calder*'s fourth category. *Id.* at 552-53. Janecka argues that *Carmell* confirms the fact that *Calder* continues to restrict the ex post facto lawmaking of both legislatures and the judiciary.

Janecka's reliance on *Carmell* is misplaced. To begin, *Carmell* was decided in 2000, well after the TCCA's 1996 opinion denying Janecka's due process claim. Thus, Janecka cannot rely on it as stating clearly established federal law *at the time the TCCA ruled on his due process claim. See Proctor*, 283 F.3d at 734-35 (stating that because "*Carmell* was decided *after* the TCCA rendered its decision in this case . . . [it could] not properly be considered a part of 'clearly established'

---

[11]The Supreme Court's recent decision in *Rogers v. Tennessee* further reinforces our conclusion that the TCCA's decision was not contrary to clearly established federal law. In *Rogers*, the Supreme Court made clear that its prior opinions in *Bouie* and *Mark* did not "go so far as to incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions." 532 U.S. 451, 459 (2001). Rather, the constitutional limitations on ex post facto judicial decisionmaking recognized in those cases developed out of due process notions of fundamental fairness and fair warning. Thus, the *Rogers* Court held that the retroactive application of new interpretations of criminal statutes and judicial alterations of common law doctrines of criminal law only implicate due process limitations "where [the new interpretation or change] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Id*. at 462.

Supreme Court law at the time of the TCCA's decision"). Moreover, even if *Carmell* reaffirms the limitation placed on legislatures by *Calder*'s fourth category, it does not suggest that the Due Process Clause creates an identical limitation on the decisionmaking power of the judiciary.

In the alternative, Janecka argues that the TCCA's decision constituted an unreasonable application of clearly established federal law. Specifically, he argues that even assuming the TCCA applied the correct "fair warning" standard to his claim, the retroactive abrogation of *Palafox* still violated the Due Process Clause because it was an "unexpected and indefensible" change in the law. *See Rogers*, 532 U.S. at 461 (stating that judicial alterations to common law doctrines of criminal law implicate the Due Process Clause "where [the alteration] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue'"). Because we believe the TCCA's assessment of this claim was correct, as well as reasonable, Janecka's argument is without merit. First, we note that the abrogation of the *Palafox* rule did not criminalize conduct that was previously lawful. Rather, the TCCA's abrogation of the rule simply relieved the State of its burden to produce evidence to refute exculpatory matter contained in a confession admitted, and hence "vouched for," by the State. Second, we believe the abrogation of the *Palafox* rule was not altogether unexpected. At the time of its abrogation, the *Palafox* and other voucher rules had long been criticized by courts and scholars as "archaic, irrational, and potentially destructive to the truth-gathering process." *Chambers v. Mississippi*, 410 U.S. 284, 296 n.8 (1973) (criticizing Mississippi's version of the voucher rule); FED. R. EVID. 607 (rejecting the voucher rule); *see also Ibanez*, 749 S.W.2d at 806-07 n.3 (noting criticism of Texas's *Palafox* rule).[12]

---

[12]We also note that, even if applied, it is far from clear that *Palafox* would mandate an acquittal based on the evidence in this case. Contrary to Janecka's assertions, the State produced substantial evidence at trial that Janecka was motivated by greed rather than fear.

In sum, the TCCA's decision rejecting Janecka's due process claim was neither contrary to nor an unreasonable application of Supreme Court precedent as it stood at the time of the TCCA's decision in 1996. As a result, the district court properly deferred to the TCCA's decision when it denied habeas relief on Janecka's due process claim. Because jurists of reason would not find the district court's resolution of this claim debatable, Janecka is not entitled to a COA on this issue.

## IV

Janecka next seeks a COA on his claim that his Sixth Amendment compulsory process right was violated when the State executed Markham Duff-Smith—the mastermind of the plot to murder the Wanstrath family—less than one month before Janecka's 1993 retrial. According to Janecka, Duff-Smith had informed his counsel that he would be willing to testify in Janecka's defense at his retrial.[13] Although Duff-Smith did not specify exactly what his testimony would entail or how it would be helpful to Janecka's defense, Janecka contends that it would have supported his duress defense and made him appear more sympathetic in the eyes of the jury during sentencing.[14]

At the time Duff-Smith spoke with Janecka's counsel, he was on death row for the 1975 murder of his mother—Kevin Wanstrath's grandmother. His execution date was scheduled to take place one-month before the commencement of Janecka's retrial. Janecka then filed two motions to stay Duff-Smith's execution. Both motions were denied, the latter on the ground that the State's interest in the timely punishment of Duff-Smith outweighed Janecka's interest in having Duff-Smith

---

[13]Duff-Smith did not participate in Janecka's first trial.

[14]In a signed affidavit, Duff-Smith stated only that "if given the opportunity, [he] could provide information and testimonial evidence relating to defensive strategies for Mr. Janecka's trial, including but not limited to, exculpatory evidence, impeachment evidence of State witnesses, rebuttal evidence, as well as mitigation evidence, if applicable."

testify in person at his trial.[15]  According to the state trial court, Janecka's Sixth Amendment right was adequately protected by Janecka's ability to depose Duff-Smith.  After his motions for stay of Duff-Smith's execution were denied, Janecka attempted to depose Duff-Smith.  Duff-Smith, however, refused to cooperate.  When called before the court to be deposed, Duff-Smith stated that he was invoking his Fifth Amendment right for purposes of the deposition, but that he would waive that privilege if called to testify at trial.

After Duff-Smith refused to testify at his deposition, Janecka submitted a sealed offer of proof outlining the testimony Duff-Smith would provide at trial.  Specifically, Janecka urged that:

1.  Duff-Smith's testimony would dispute that Janecka was in the chain of remuneration for this crime;

2.  Duff-Smith's testimony would establish that he did not pay Walt Waldhauser to pay Janecka to murder;

3.  Duff-Smith would testify that various state witnesses were lying;

4.  Duff-Smith would testify that if Janecka did murder for hire, he did it out of duress from the mafia; and

5.  Duff-Smith would testify in mitigation of sentence.

Janecka then reurged his motion to stay Duff-Smith's execution, but his motion was again denied.  Four days later, the State of Texas executed Duff-Smith.  Duff-Smith's final words were: "I am a sinner of all sinners.  I was responsible for the 75 and 79 cases.  My trial was not just; it was not fair; they lied against me."

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."  U.S. CONST. amend.

---

[15]Janecka's first motion was dismissed for want of jurisdiction. Janecka then re-filed his motion in the appropriate court.

VI. The Supreme Court has made clear, however, that in order to establish a violation of the compulsory process right, a petitioner must show more than the mere absence of a defense witness's testimony at trial. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *Washington v. Texas*, 388 U.S. 14 (1967). Rather, a petitioner "must at least make some plausible showing of how [the absent witness's] testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867 (holding that defendant's compulsory process right was not violated by the deportation of illegal aliens who could be defense witnesses because defendant could not show lost testimony would have been material, favorable, and not merely cumulative).

Janecka has failed to make the requisite showing under *Valenzuela-Bernal*. Janecka's explanation of how Duff-Smith's testimony might have been material and favorable to his defense is vague at best. He fails to offer any details regarding what specific information Duff-Smith could have provided or why Duff-Smith's testimony would not have been merely cumulative of other evidence presented at trial. The only specific point Janecka suggests Duff-Smith would have made had he been able to testify at trial was that he did not pay Waldhauser to hire Janecka to murder the Wanstraths. Janecka has failed to show how this point could have helped his defense. Because the State's theory was that Waldhauser, rather than Duff-Smith, paid Janecka to kill the Wanstraths, any evidence that Duff-Smith did not intend for Waldhauser to hire Janecka would have been of little value.[16]

---

[16]To the extent Janecka complains that the State denied him the opportunity to obtain more detailed information regarding Duff-Smith's potential testimony, this argument is without merit. Janecka had an opportunity to interview Duff-Smith about his potential testimony before his death. Rather, it was Duff-Smith's refusal to speak outside of Janecka's trial in what appears to have been an attempt to delay his execution that prevented Janecka from obtaining this information. *Valenzuela-Bernal*, 458 U.S. at 873 (refusing to lower specificity requirement because petitioner had access to sufficient information about the witnesses to determine how their testimony would be material and favorable to his defense).

Moreover, even assuming Janecka has established materiality and favorableness, the absence of Duff-Smith's testimony from Janecka's retrial and sentencing hearing was harmless. *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (stating that compulsory process violations are subject to harmless-error review). The State's evidence of guilt in this case was overwhelming. In addition to linking Janecka to the murder weapon, Janecka confessed three times to the murder of Kevin Wanstrath. The State also presented evidence that Janecka received several cash payments for the Wanstrath murders, and that Janecka attempted to use the gun and the can of mace to pressure Waldhauser into giving him more money. The State's presentation at Janecka's sentencing hearing was also overwhelming. In addition to the vileness of shooting a baby through the head as he lay in his crib, Janecka had been linked to at least four murders for hire as well as several instances of domestic violence. Witnesses testified to murderous threats made by Janecka on various occasions. In light of this evidence, it is highly unlikely that Duff-Smith's testimony would have affected the jury's decisions to convict Janecka of capital murder and to sentence him to death. *Brecht v. Abrahamson*, 507 U.S. 619, 637 & 639 (1993) (concluding that error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict").

Because Janecka has failed to make a substantial showing of the denial of his compulsory process right, he is not entitled to a COA on this claim.

## V

Finally, Janecka seeks a COA on his claim that the state trial court admitted "irrelevant and prejudicial victim-impact evidence" during the sentencing phase of his trial in violation of his Eighth and Fourteenth Amendment rights. Specifically, Janecka argues that statements made by two of the State's witnesses at sentencing were so inflammatory that they exceeded the scope of victim-impact

-17-

evidence allowed by the Supreme Court in *Payne v. Tennessee*. 501 U.S. 808 (1991). Janecka also

argues that the statements exceeded *Payne* because they were given by people who were neither

related to nor had a relationship with Kevin Wanstrath prior to his death.

In *Payne v. Tennessee*, the Supreme Court held that the Eighth Amendment presents no *per*

*se* bar to the admission of victim-impact evidence during the penalty phase of a capital trial. *Id.*[17]

According to the Court:

> Victim impact evidence is simply another form or method of informing the sentencing
> authority about the specific harm caused by the crime in question, evidence of a
> general type long considered by sentencing authorities. . . . In the majority of cases,
> . . . victim impact evidence serves entirely legitimate purposes. . . . [A] State may
> properly conclude that for the jury to assess meaningfully the defendant's moral
> culpability and blameworthiness, it should have before it at the sentencing phase
> evidence of the specific harm caused by the defendant.

*Id.* at 825. Although the Court held that the Eighth Amendment poses no per se bar to victim-impact

evidence, its opinion left open the possibility that in a specific situation, an Eighth Amendment

problem may result. Moreover, the Court noted that "[i]n the event that evidence is introduced that

is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the

Fourteenth Amendment provides a mechanism for relief." *Id.*

Janecka first challenges the admission of the testimony of Judge Ted Poe. Judge Poe, in his

former capacity as an Assistant Harris County District Attorney, had prosecuted one of Janecka's co-

defendants. Judge Poe was apparently called by the State to rebut Janecka's argument that

sentencing him to death would be grossly unfair in light of the fact that Waldhauser and Paul

---

[17]In *Payne*, the Supreme Court reconsidered its prior holdings in *Booth v. Maryland*, 482 U.S.
496, 509 (1987) (holding that the Eighth Amendment prohibits a jury from considering a victim-
impact statement at the sentencing phase of a capital trial), and *South Carolina v. Gathers*, 490 U.S.
805, 811-12 (1989) (extending the rule announced in *Booth* to statements made by a prosecutor to
the sentencing jury regarding the personal qualities of a victim).

McDonald, both accomplices in the murders, were free men by the time of Janecka's retrial. After explaining the relatively lenient treatment of Waldhauser and McDonald, however, Judge Poe went on to testify about the additional issue of how his life had been profoundly affected and "forever changed" by the death of Kevin Wanstrath and his contact with this case. Over the objections of Janecka's counsel, Judge Poe testified that he had a child who was now the same age as Kevin would have been had he lived. Judge Poe also testified that he kept a photo of Kevin on his desk at work—both in his former capacity as a prosecutor and in his current capacity as a judge.

In addition to the testimony of Judge Poe, Janecka also challenges the admission of the testimony of Michael Chavis. The State called Chavis to testify about how Janecka attempted to recruit him in an effort to rip off a drug dealer. Over Janecka's objection, however, Chavis went on to testify about how the killing of Kevin Wanstrath "affected" him. Chavis testified that the loss of his leg in an unrelated accident did not compare to the pain caused by his knowledge that he might have prevented the offense but did not do so.

Assuming *arguendo* that the admission of Judge Poe's and Chavis's challenged testimony was constitutional error, Janecka's claim still fails because he has not shown that the testimony had a "substantial and injurious effect or influence in determining the jury's [punishment] verdict." *Brecht*, 507 U.S. at 637.[18] To begin, the challenged statements constituted only a small part of Judge Poe's and Chavis's otherwise properly-elicited testimony. Moreover, they were only a brief part of the

---

[18]At oral argument on this case, Janecka's counsel suggested that Judge Poe's testimony was per se prejudicial because it was given by a sitting judge. Because this argument would be a vast extension of *Payne*, and would require us to state a new rule of constitutional law, it is barred by *Teague*. *Teague v. Lane*, 489 U.S. 288 (1989).

-19-

State's overall case at sentencing, which included nine witnesses testifying over a two-day period.[19]

The State also did not refer to the testimony of Judge Poe and Chavis in its closing statement.

Finally, in light of the other evidence before the jury at sentencing, including testimony that Janecka was the only person involved who was willing to shoot the baby, Janecka's history of brutality against persons close to him, and evidence of his involvement in at least four murders for hire, it is highly improbable that the jury would have sentenced him differently had the statements been excluded.[20]

Because Janecka has failed to make a substantial showing of the denial of his Eighth and Fourteenth Amendment rights, he is not entitled to a COA on this claim.

## VI

For the foregoing reasons, Janecka has failed to make a substantial showing of the denial of any constitutional rights. We therefore DENY his request for a certificate of appealability on each of his claims.

---

[19]Janecka presented twenty-three witnesses of his own testifying over three days, including nine family members, five prison officers, eight friends, and a mental-health expert.

[20]At oral argument on this case, Janecka's counsel urged that it was not necessary for Janecka to show that the admission of the challenged statements substantially influenced the jury's verdict because this case falls within *Brecht*'s footnote nine. In *Brecht*'s footnote nine, the Court noted the possibility of "an unusual case" in which there occurs "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct" that might so "infect the integrity of the proceedings as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht*, 507 U.S. at n.9. Having reviewed the record, we are not persuaded that the facts of this case present such an "unusual case."